ALUMINUM COMPANY OF AMERICA,
Appellant,

v.

ELECTRO FLO CORPORATION, a corporation, and Ashley L. Robison,
Appellees.

No. 71–1276.

United States Court of Appeals,
Tenth Circuit.

Nov. 30, 1971.

**1116**

Kent Shearer, Salt Lake City, Utah, for appellant.

Jackson Howard, Provo, Utah, for appellees.

Before LEWIS, Chief Judge, and HAMLEY * and HILL, Circuit Judges.

HAMLEY, Circuit Judge.

Aluminum Company of America (Alcoa) brought this diversity action against Electro Flo Corporation and Ashley L. Robison on an open account for goods sold and delivered to Electro Flo and guaranteed by Robison, its president. Electro Flo, which is a manufacturer and vendor of amusement rides and devices in Salt Lake City, Utah, counterclaimed for breach of warranty. After a trial without a jury the district court granted Electro Flo judgment in the amount of $58,554.67 upon its counterclaim after deducting from breach of warranty damages in the stipulated balance of $11,-445.33 due on the open account. Alcoa appeals. We affirm.

We draw upon the findings of the district court, unchallenged except as to the amount of damages, for the following statement of facts. Between 1962 and 1967, U. Stancil Mangum developed an electrified low-voltage floor, which would provide power to operate "Whirley Dodge" vehicular units for amusement purposes. Defendant Electro Flo was then incorporated for the purpose of making commercial use of this idea. In July, 1968, employees of Electro Flo developed the concept of a collapsible electrified floor that carnival companies could transport from place to place by trailer and utilize for Whirley Dodge operations. The floor would fold out to a dimension of approximately forty by sixty feet and would, when contracted, constitute the sides and floor of a mobile trailer unit.

In July, 1968, shortly after its employees conceived this idea, officials of Electro Flo inquired of various aluminum companies in an attempt to enlist support to assist Electro Flo in the development of this concept. Alcoa responded to the inquiry and sent its representative, William M. Foster, to meet with representatives of Electro Flo. This meeting took place on July 30, 1968, at Salt Lake City. At this time Foster was shown a fixed electrified floor and Whirley Dodge vehicles operating on it.

In the months of August and September, 1968, Robison, on behalf of Electro Flo, went to Los Angeles at the invitation of Alcoa to discuss potential uses for aluminum in the development of Electro Flo's electrified floor. Among the matters discussed at that time were the production of a mobile low-voltage electric floor and the utilization of such floor, carried by trailer, for Whirley Dodge amusement vehicles. Alcoa officials took Robison to that company's design and research laboratory and introduced him to Dale Stultz, a design engineer. Alcoa also introduced Robison to Donald E. Mock of Anjac Plastics, Inc. (Anjac), in connection with the supplying of insulation material for the proposed floor.

As a result of the meeting in Los Angeles in September, 1968, Alcoa undertook to design and produce flooring ma-

---

* Of the Ninth Circuit, sitting by designation.

terial that could be assembled, with suitable insulation supplied by Anjac to design specifications of Alcoa, to meet the panel floor requirements of Electro Flo's trailer. These requirements were that the floor sections be rigid and lightweight, that they present a smooth surface with minimal joints, that they conduct low-voltage electricity, that they be easily assembled into nine feet by forty feet panels, that such panels be capable of constituting a floor for the operation of the Whirley Dodge vehicles when lowered, and that the panels constitute sides for the trailer when in a raised position.

Electro Flo agreed to pay tooling expenses for particular extrusions and parts designed by Alcoa, and agreed to pay for the necessary materials to produce the aluminum goods for three trailers. On September 20, 1968, Electro Flo placed an order with Alcoa for these materials. Alcoa supplied the materials to Electro Flo in early November, 1968.

By November 11, 1968, after it had begun to assemble the materials, Electro Flo discovered that the flooring designed and produced by Alcoa was inadequate to meet the requirements of Electro Flo. This inadequacy was due to the fact that the flooring was overly flexible, that it had numerous joints that were not smooth, and that it was difficult, if not impossible, to assemble. Electro Flo notified Alcoa of the defects in the goods on November 11, 1968. Alcoa responded by telling Electro Flo that it would continue to work on the problem in an effort to find a solution. In the meantime Electro Flo was unable to proceed with its trailer project.

In early December, 1968, Alcoa invited Electro Flo to send representatives to Pittsburgh to meet with Alcoa's design and engineering staff in an attempt to overcome the defects complained of by Electro Flo. As a result of this meeting, Alcoa recommended to Electro Flo that the following material design changes

be made: (a) that the "hat" sections previously designed to brace the floor and add rigidity be eliminated; and (b) that half-inch plywood be substituted as backing for the aluminum floor planking, to be attached by screws and bolts. These revisions required Electro Flo to make material changes in its trailer capacity and substantially increased the weight of the floor sections.

Early in January, 1969, Robison signed a guarantee provision for Alcoa. This guaranty was induced by Alcoa's representation that it would redesign its planking for a permanent installation for Elitch Gardens, an Electro Flo customer in Colorado, and the further representation that Alcoa would supply materials to Electro Flo conforming to Alcoa's redesign specifications for mobile trailer floors and for permanent installation. After securing the guarantee from Robison, Alcoa failed and refused to supply materials to meet its modified design although it did redesign planking for use in making the permanent installation for Elitch Gardens.

Electro Flo proceeded to build its trailer in accordance with Alcoa's redesign recommendations of December, 1968. By June, 1969, the trailer was complete and was placed on location at Portland, Oregon for demonstration purposes. Electro Flo attempted to use the additional planking that it had not used for trailer construction in the Elitch Gardens installation, completing this work by June, 1969.[1] However, both the trailer floor and the Elitch Gardens permanent installation failed because of unsmoothness, unstable insulation, and instability, undue flexibility and excess weight of the floor redesigned for trailer use.

Because of these inadequacies in the goods furnished by Alcoa, Electro Flo abandoned all of these materials and floors in the latter part of June, 1969, and attempted to find another person or firm to design an adequate low-voltage electrified floor. Electro Flo incurred

---

1. The findings of fact give the date as 1968. The sequence of other events in the findings, however, lead us to think that the correct date for completion of the Elitch Gardens installation was probably in 1969. The error is not material.

expenses and costs in the development of its product during the period from September 1, 1968 to June 30, 1969, in the amount of $127,836.60, of which seventy thousand dollars is reasonably attributable to the failure of Alcoa to design and supply goods to meet Electro Flo's particular floor requirements.

On the basis of these facts, the district court concluded that Alcoa had impliedly warranted that the goods it supplied to Electro Flo would meet the latter's known requirements, as described above. The court further concluded that Alcoa had failed to supply goods meeting those requirements and had therefore breached its implied warranty.

On this appeal Alcoa argues that the trial court erred in concluding that there was an implied warranty that the goods would be fit for the particular purpose for which they were supplied. The crux of Alcoa's argument is that the transaction should be characterized as one for professional engineering and design services rather than as a sale of goods, and that there is no implied warranty as to such professional services.

■ While it is true that Alcoa utilized design engineers on the project, these services were for the purpose of enabling Alcoa to fulfill Electro Flo's requirements for goods. Electro Flo did not order or contract for engineering. Alcoa's full charge was for materials furnished; its offer was by price quotation for the products only, and it did not bill for engineering services or seek compensation therefor save as the cost of such services entered into the price for the materials delivered. On balance, we think the district court's conclusion that the contract was one for the sale of goods, rather than professional services, is amply supported by the findings of fact, which are substantially accepted by Alcoa, and by the record as a whole. We think the reference to design undertakings in the findings of fact were properly included to show Alcoa's expertise and knowledge of purpose, and Electro Flo's reliance thereon, rather than to nega-

tive the characterization of the transaction as a sale of goods.

Our conclusion is supported by Sperry Rand Corporation v. Industrial Supply Corporation, 337 F.2d 363 (5th Cir. 1964). While that case involved legal questions distinct from those at issue here, the factual setting was closely analogous to that in the present case. In *Sperry Rand,* as here, the court had before it a transaction in which the seller's experts studied the buyer's needs and developed a specially designed product to fulfill those needs. The court had no trouble in characterizing the entire transaction as the sale of a product rather than as a professional service contract, or in applying the warranty doctrines which arise in sales of goods. *See also* Beech Aircraft Corporation v. Flexible Tubing Corporation, 270 F.Supp. 548 (D.C.Conn.1967).

The cases relied upon by Alcoa are not to the contrary. Of the cited cases, only Perfecting Service Co. v. Product Development and Sales Co., 261 N.C. 660, 136 S.E.2d 56 (1964) considered transactions involving both professional services and the sale of goods. The court in *Perfecting Service,* however, found that the professional design services and the sale of goods were governed by two entirely distinct and separate contracts with different parties. The court's statements that no implied warranties would arise had reference only to the separate professional services contract, and the case is thus inapposite here.

We hold that the transaction between Alcoa and Electro Flo, while it involved some engineering and design aspects, was in essence a sale of goods. We therefore need not decide whether there is an implied warranty in a professional service contract.

Alcoa raises several other arguments which, if correct, would undermine the trial court's conclusion that there was an implied warranty of fitness for a particular purpose.

■ First, Alcoa correctly notes that one of the major difficulties encountered

in the electrified flooring was with the insulation, which was supplied by Anjac, and concerning which Alcoa performed only design services. But the difficulty was not intrinsic in the insulation; it was, instead, due to the fact that, in conjunction with the aluminum strips, it did not perform its intended function. Alcoa undertook to supply aluminum products which, when used in conjunction with the insulation it had designed, would meet Electro Flo's needs. Alcoa failed in this undertaking.

■ Second, Alcoa argues that goods manufactured to a buyer's specifications do not give rise to an implied warranty of fitness. That doctrine, however, applies only where the buyer furnishes precise technical specifications. *Compare* Maryland Casualty Co. v. Independent Metals Co., 203 F.2d 838, 844–845 (8th Cir. 1953) *with* Peters v. Lyons, Iowa, 168 N.W.2d 759 (1969). *See* Uniform Commercial Code, Official Comment 2 to Section 2–315. In the present case, the findings of fact show that Electro Flo informed Alcoa of its needs in general terms and relied on Alcoa's expertise in developing the specific product. If sellers were to be excused from implied warranties of fitness whenever a buyer makes his general requirements known, there could seldom be such warranties. We conclude that the general statements made by Electro Flo did not act to defeat the implied warranty of fitness in this case.

■ Third, Alcoa contends that where a seller furnishes a known, described, or defined article agreed upon, he does not warrant its fitness for his buyer's purpose, although the buyer discloses that purpose. That rule has no application in this case, because the goods were expressly tailored for Electro Flo's use. *See* Sperry Rand Corporation v. Industri-

al Supply Corporation, *supra*, 337 F.2d at 371–372.

■ The unchallenged findings of fact in this case indicate that at the time of contracting to supply the goods in question, Alcoa had reason to know the particular purpose for which the goods were required. Under the findings, Alcoa also had reason to know that Electro Flo was relying on Alcoa's skill and judgment in furnishing suitable goods. These circumstances adequately support the district court's determination that Alcoa impliedly warranted the fitness of the goods for the purpose intended.[2] Under the evidence, Alcoa breached that warranty and the district court correctly held Alcoa liable therefor.[3]

Alcoa further argues, however, that the trial court erred, in part or in whole, in its assessment of damages.

In its counterclaim, Electro Flo alleged that as a direct and proximate result of Alcoa's delivery of goods that were unsuitable for Electro Flo's purpose, the latter suffered the loss of profits on numerous prospective sales and incurred substantial and unrecoverable expenses and was otherwise damaged in the amount of one million three hundred thousand dollars.

The trial court disallowed damages for future profits on the ground that they were speculative, and found that Electro Flo incurred expenses and costs in the frustrated development of its product during the period September 1, 1968 through June 20, 1969, in the amount of approximately $127,836.60. The court found that, of this sum, seventy thousand dollars is reasonably attributable to the failure of Alcoa to design and supply goods to meet the requirements of Electro Flo in accordance with its implied warranty.[4]

2. The Uniform Commercial Code was in force in all the jurisdictions whose substantive law might conceivably govern this contract. Section 2–315 of the Code sets forth the requirements for an implied warranty of fitness, and that section is substantially identical in all relevant jurisdictions. *See, e. g.,* Utah Code Annotated, 70A–2–315.

3. We need not pass upon Electro Flo's further contention that Alcoa breached an express warranty.

4. As noted at the outset of this opinion, the trial court deducted from this seventy

In questioning the seventy-thousand-dollar allowance for actual damages, Alcoa first asserts that there is no evidence of the reasonableness or necessity of the individual expenditures listed by Electro Flo in the base exhibit upon which the award is founded. Alcoa also contends that the award must be set aside because there was no proper apportionment as between expenses attributable to Alcoa's alleged breach of warranty and other expenses.

Electro Flo sought to prove its damages by producing evidence concerning expenditures made or incurred by it attributable to its trailer development which expenditures were not recoverable. The evidence consisted principally of defendant's accounting exhibit 61, and associated testimony by Robison and Roger Arden Oliphant. The accounting exhibit, consisting of thirteen large sheets containing more than five hundred items, and a schedule of adjustments, allocates specified expenditures, item by item, between "trailer," "cars," and "other." The total allocated to "trailer" is $83,452.38, of which $62,853.60 had been paid, and the balance was owing.

Robison testified that the exhibit is a summary of Electro Flo's expenses paid or incurred in trying to develop the mobile trailer in accordance with Alcoa's plans. He further testified that he made the allocation described above on the basis of the names of the manufacturer or vendor, and his own recollection. Oliphant testified that he had supporting documents for each of the charges shown on exhibit 61. He also stated that the items representing actual disbursements came from the company's cash disbursement register and that the remaining items came from the schedule of accounts payable he had made up for the Small Business Administration.

In our view the general purport of this evidence is that all of the items allocated to "trailer" were necessary in connection with the development of that vehicle as a carrier for the proposed portable aluminum flooring. Alcoa appears to concede that with respect to the $62,853.60 of these items which had been paid, it may be assumed that the items were reasonable. *See* Barlow v. Salt Lake & U. R. Co., 57 Utah 312, 194 P. 665, 674 (1920).

■ As to the remaining items which had not been paid, there was no specific testimony that they were reasonable. But, in the absence of any contrary evidence developed by Alcoa on cross-examination or otherwise, we think the trial court was entitled to assume that these items, which were supported by invoices and had been reported to the Small Business Administration, were also reasonable.

At the very least, Electro Flo appears to have proved its damages in a manner which is "reasonable" under the applicable Commercial Code provision. *See* Utah Code Annotated, 70A–2–714. Had Electro Flo been required to produce affirmative evidence of the necessity and reasonableness of each of the hundreds of items listed in its exhibit, the task would have been monumental. We cannot therefore, say that the lack of further proof of reasonableness or necessity made the district court's damage findings clearly erroneous.

Alcoa also suggests several ways in which apportionment of items should have been, but was not, made in addition to the allocation between "trailer," "cars," and "others." The argument on this point, however, is quite general in nature, and we cannot, with assurance, determine that the trial court erred in failing to recognize deficiencies of this kind in the evidence. We find little in the record to indicate that Alcoa questioned the apportionment of expenditures at the time of the trial. Moreover, the trial court apparently made a considerable allowance for apportionments of the kind suggested by Alcoa since its seventy thousand dollar figure is substantially

thousand dollar figure the $11,445.33 which Electro Flo owed Alcoa on the open account, and awarded Electro Flo judgment for $58,554.67.

below the $83,452.38 total for items listed in exhibit 61 under "trailer."

In a case of this character considerable latitude must be allowed the trial court in evaluating evidence as to damages. We hold that the evidence as to damages is adequate to support the award that was made.

Affirmed.