BELMONT INDUSTRIES, INC.

v.

BECHTEL CORPORATION and Union Carbide Corporation.

Civ. A. No. 75–1743.

United States District Court,
E. D. Pennsylvania.

Dec. 10, 1976.

Bernard S. Bergman, Philadelphia, Pa., for plaintiff.

George J. Miller, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the Court is defendants' motion for summary judgment, pursuant to Fed.R.Civ.P. 56, in this diversity action. Defendants' primary contention is that this is an action for breach of a contract for sale within the meaning of the Uniform Commercial Code, as enacted in Pennsylvania, and that, accordingly, the suit is time-barred by the applicable four-year statute of limitations found at 12A P.S. § 2–725 (1970). For the reasons stated below, the Court agrees with defendants and will grant their motion.

The material facts relevant to this motion, undisputed except as to their legal significance, are as follows: In early 1969, Bechtel Corporation ("Bechtel"), through Bechtel Constructors, Inc. ("Bechtel Constructors"), was engaged by Union Carbide Corporation ("Union Carbide") as general contractor for the construction of a petro-chemical complex near Ponce, Puerto Rico. On June 9, 1969, Bechtel Constructors issued an invitation for bids to furnish and install, on a "turnkey" basis, the container handling system at the Union Carbide complex's marine facility. Badrena & Perez, Inc. ("B&P"), submitted its bid on August 15, 1969. That bid anticipated the erection of a large steel structure, to be used in loading and unloading ships, composed of a crane runway, over which would run a crane assembly, and a movable apron extending over the water. Belmont Iron Works ("Belmont"), a division of plaintiff Belmont Industries, Inc., was to design the structure, fabricate the steel for it and deliver the steel to B&P in Puerto Rico. Other subcontractors to B&P were to erect the structure, supply the crane assembly, supply the controls system, sandblast and paint the steel, as well as provide additional work and materials.

At a "pre-award" meeting on January 22, 1970, the proposed contract between Bechtel Constructors and B&P was discussed in detail and B&P was advised shortly thereafter that it was the successful bidder. A subcontract was sent by Bechtel Constructors to B&P on March 23, 1970. On April 16, 1970, B&P sent a proposed sub-subcontract to Belmont. That document provided that Belmont would "supply all steel structures at job site . . ."[1] for a lump-sum price of $338,420. [Ex. D–78.] Although several letters were subsequently exchanged between B&P and Belmont regarding its terms, Belmont never returned the executed sub-subcontract to B&P. Nevertheless, on the assumption that there was some kind of agreement with B&P, Belmont continued to take actions apparently directed towards fulfillment of that agreement concerning the container handling facility.

In early July, 1970, Belmont advised representatives of B&P, Bechtel and Union Carbide that, due to disagreement over the employment of a consulting engineer, it could not continue to accept design responsibility for the structure. Belmont would thereafter act only as a material supplier, fabricating in accordance with plans and specifications submitted by others. On July 22, 1970, Belmont sent B&P a proposed sub-subcontract pursuant to which Belmont would be obligated "solely to [sic] the prep-

---

1. This language was subsequently changed, by agreement, to require that Belmont "supply all structural steel F.O.B. ON TRUCKS at job site. . . . " In addition, the scope of Belmont's work was agreed to be "structural steel, walkways, ladders and work the mechanical involvement at the outboard end." [Ex. D–79; Ex. D–83.]

aration of shop detail drawings from plans and specifications submitted by others and the fabrications [*sic*] and delivery of structural steel based thereon." [Ex. D–34.] Belmont's compensation was still to be a lump-sum payment of $338,420.[2] The proposed sub-subcontract was apparently never signed. However, despite the absence of a written contract, Belmont was doing work as a supplier for the project as late as October 26, 1970.

In mid-October, 1970, B&P encountered financial difficulties and asked to be allowed to withdraw from its subcontract with Bechtel. The Bechtel-B&P subcontract was formally terminated on October 24, 1970.

On November 9, 1970, Bechtel sent a letter to Belmont asking Belmont to enter into a contract directly with Bechtel, on a purchase order basis, for the fabrication and delivery of the steel for the container handling facility. The price terms of the proposed contract would be the same as had been agreed between Belmont and B&P. On November 10, 1970, Bechtel informed Belmont by letter that if it would not agree to transfer its original obligation, on the same terms, from B&P to Bechtel, it would be free to make a new proposal pursuant to the open bid request which had been sent to other steel fabricators the previous day. Bechtel and Belmont were unable to reach agreement on a price for the transfer contract. On November 24, 1970, Bechtel entered into an agreement with Owen Steel Company ("Owen") pursuant to which Owen would provide the steel for the container handling facility. Belmont was aware of Bechtel's agreement with Owen by early December, 1970.

Based upon this series of events, Belmont filed a three-count complaint on June 18, 1975. The first count sets forth a claim for breach of contract and requests both compensatory and punitive damages. The second count sets forth a claim for a quantum meruit recovery based on the same agreement alleged in Count I.[3] The third count of the complaint, which seeks compensatory and punitive damages, alleges that defendants "wilfully and maliciously concealed from the fabricator they selected to replace Belmont, knowledge of Belmont's procurement of the specially manufactured materials. This act of concealment was committed with the intent to, and with the effect of, denying Belmont the opportunity to sell said material to that fabricator."

For purposes of this motion, defendants concede that any contractual obligations which existed ran between Belmont and defendants, rather than Belmont and B&P, and they do not contend at this time that there was no agreement between the parties.

Before addressing the issue of the applicability of the statute of limitations for actions on sales contracts to this case, several preliminary observations should be made. First, the Court agrees with defendants that Count III of the complaint fails to state a claim upon which relief can be granted. Plaintiff has cited no authority, and the Court is unaware of any, which suggests that defendants' alleged actions constitute an independently recognizable cause of action. Rather, Count III simply alleges that defendants "wilfully and maliciously" prevented plaintiff from mitigating damages which resulted from defendants' alleged breach of contract.[4] Proof of

---

**2.** Belmont subsequently revised this price to $328,420. [Ex. D–37.]

**3.** Plaintiff's memorandum in opposition to defendants' motion for summary judgment suggests that Count II also sets forth a valid claim of unjust enrichment. We disagree. In order to recover on such a quasi-contractual claim, there must be both (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied. *Meehan v. Cheltenham Township*, 410 Pa. 446, 449, 189 A.2d 593, 595

(1963). While plaintiff has alleged its own loss—*i. e.*, the value of labor expended and materials procured—neither the complaint nor the other documents before the Court demonstrate that defendants have in fact been benefitted. Accordingly, plaintiff's reliance on the unjust enrichment doctrine is misplaced.

**4.** Our interpretation of Count III is buttressed by a comparison of its language with that of paragraphs 28 and 29 of Count I of the complaint, which read as follows:

such a claim would affect the amount of damages recoverable if a breach of contract by defendants is established, but would not entitle plaintiff to a separate award independent of the contract action.

Count II also fails to state a claim upon which relief can be granted. A quantum meruit action is appropriate to recover the value of services performed and accepted on the basis of a contract for those services which left unspecified what the compensation would be. *See Lach v. Fleth,* 361 Pa. 340, 348, 64 A.2d 821, 825 (1949). The important point is that recovery is based on the existence of an agreement, express or implied, for the performance of services. We hold here, however, that the contract was one for the sale of goods. Defendants contracted for the purchase of fabricated steel from plaintiff. The price which they agreed to pay was for receipt of the finished goods, not for any work and labor involved in the production of the goods. A quantum meruit recovery is incompatible with the concept of a contract for the sale of goods.

Finally, the Court concurs with defendants that the agreement sued upon here was not a construction contract, which would make the general six-year limitations period for breach of contract applicable.

Examination of *DeMatteo v. White,* 233 Pa.Super. 399, 336 A.2d 355 (1975), and cases cited therein,[5] makes clear that such a contract is one in which the obligation to furnish materials, if present at all, is merely incidental to the main purpose—namely, the assembling of the materials into a new, different and completed unit. Belmont clearly had no contractual responsibility here related to the actual building of the container handling facility. It also follows that this is not an action to recover damages for a deficiency in the supervision or observation of construction of an improvement to real property, which would bring into play the twelve-year statute of limitations found at 12 P.S. § 65.1 (Supp.1976).

This brings us to the central issue of the case concerning the applicability of the four-year statute of limitations for actions for breach of a contract for sale.[6] There is no question that if that statute of limitations applies here, this contract action may not be maintained.[7] We also consider it beyond dispute that the fabricated structural steel and accessory items to be furnished by plaintiff under the contract constituted "goods" as that term is defined in 12A P.S. § 2–105(1).[8] Plaintiff asserts, however, that the design services which it was to provide under the contract take the agreement out of the ambit of the sales provi-

---

28. Upon or prior to breaching the Agreement with Belmont, Bechtel and Union Carbide had selected another fabricator, but did not advise that fabricator that Belmont had made commitments for the procurement of steel specially manufactured for the Cargo Facility and which that fabricator could purchase from Belmont.

29. The aforestated breaches and actions . . . were committed in bad faith and with a wilful, intentional and malicious intent to breach the Agreement.

5. While there may be questions regarding the choice of substantive law to be applied in this case, the parties have proceeded on the assumption that Pennsylvania law governs the issue of the applicable statute of limitations. There is nothing before the Court to suggest that the parties have made an erroneous assumption. *See Schenk v. Piper Aircraft Corp.,* 377 F.Supp. 477 (W.D.Pa.1974), *aff'd mem.,* 521 F.2d 1399 (3d Cir. 1975).

6. 12A P.S. § 2–725 provides, in pertinent part, as follows:

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.

7. All acts alleged in the complaint to have been a breach of contract occurred prior to 1971. The complaint was not filed until June 18, 1975.

8. 12A P.S. § 2–105(1) provides, in pertinent part, as follows:

(1) "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ..

sions of the Uniform Commercial Code. While there were some design aspects to plaintiff's contractual responsibilities, the Court believes that the essence of this transaction was a sale of goods.

The design services involved here were incidental to the basic purpose of the contract, which was the provision of the structural steel to be used in the construction of the container handling facility. In an analogous factual situation, the court in *Aluminum Company of America v. Electro Flo Corp.*, 451 F.2d 1115 (10th Cir. 1971), concluded that a contract for the sale of goods existed which was controlled by the provisions of the Uniform Commercial Code. In that case, Alcoa undertook to design and produce flooring material that could be assembled to meet the requirements of Electro Flo's mobile floor idea for Whirley Dodge amusement vehicles. Based upon Alcoa's failure to design and supply goods to meet Electro Flo's particular floor requirements, the district court concluded that Alcoa had breached an implied warranty that the goods would be fit for the particular purpose for which they were supplied. The appellate court upheld the characterization of the contract as one for the sale of goods, stating:

> While it is true that Alcoa utilized design engineers on the project, these services were for the purpose of enabling Alcoa to fulfill Electro Flo's requirements for goods. Electro Flo did not order or contract for engineering. Alcoa's full charge was for materials furnished; its offer was by price quotation for the products only, and it did not bill for engineering services or seek compensation therefor save as the cost of such services entered into the price for the materials delivered. *Id.* at 1118.

In the instant case, there was a similar lump-sum price quotation which incorporated the cost of engineering services. While there was an adjustment made in the price for the work after further design responsibilities were disclaimed by plaintiff in July, 1970 [Ex. D–36; Ex. D–37], this does not alter the fact that the single compensation figure sought by plaintiff was for the furnishing of materials to be used in the construction of the container handling facility. The fact that a specially designed product to fulfill the needs of the project was required does not negate the characterization of the transaction as a sale of goods. Accordingly, the four-year statute of limitations of 12A P.S. § 2–725 applies here and bars the maintenance of an action on the claim set forth in Count I of the complaint.[9]

For all of the above-stated reasons, defendants' motion for summary judgment will be granted.

---

**9.** The defense of the running of the applicable statute of limitations is properly asserted in a motion for summary judgment. 10 *Wright and* *Miller, Federal Practice and Procedure: Civil* § 2734 (1973).