STANDARD STRUCTURAL STEEL CO.

v.

DEBRON CORPORATION, et al.

Civ. No. H–76–253.

United States District Court,
D. Connecticut.

Aug. 29, 1980.

804

Arthur Weinstein, Michael Kulick, Hartford, Conn., for plaintiff.

Peter Ryan, Darien, Conn., James A. Pemberton, Jr., King & King, Washington, D. C., Henry Ide, Bailey & Wechsler, Hartford, Conn., for defendant.

## EXCERPTS FROM MEMORANDUM OF DECISION *

BLUMENFELD, District Judge.

This is an action for breach of contract, with jurisdiction properly founded upon diversity of citizenship, 28 U.S.C. § 1332(a)(1).

---

\* Following the district court's issuance of a 112-page Memorandum of Decision in this action, the defendants appealed to the Court of Appeals for the Second Circuit. The Second Circuit affirmed the district court's judgment *per table*, No. 80–7810, in an unpublished memorandum opinion dated March 18, 1981.

Because the district court's application of the Uniform Commercial Code to the transaction at issue in this case, as well as its use of a promissory estoppel theory to sustain one of the plaintiff's claims may be of some value as precedents, the following excerpts from the district court's opinion containing the background facts of the case and the district court's analysis of the UCC and promissory estoppel issues are submitted for publication in the official reports.

The plaintiff, Standard Structural Steel Co. (Standard), is, among other things, an erector of structural steel. The defendant Debron Corporation (Debron) at all relevant times operated a division known as Indiana Bridge, which fabricates structural steel at its plant in Muncie, Indiana.[1] The defendant Commercial Union Insurance Co. (Commercial) issued a performance bond, as well as a labor and materials payment bond, in connection with the contract at issue here and is being sued thereon after allegedly refusing Standard's demand for payment. Debron and Commercial have in turn filed various counterclaims against Standard.[2]

After more than three years of discovery and occasional unsuccessful settlement efforts, a court trial of this action began on January 23, 1980. The trial consumed 27 days, extending over nearly six months, and concluded on July 2, 1980. Thousands of exhibits were received in evidence, though most without objection. The subject matter of the trial was highly technical, often requiring extended explanations by the parties' witnesses. As if the case was not thus sufficiently complicated, the court's task was made even more difficult by the fact that a trial not of one case but of more than 200 mini-cases was necessary. At last, however, the time for a decision on the merits is at hand. A recitation of the background facts provides an appropriate starting point.

## I. BACKGROUND

In May 1973, Standard received from the Gilbane Building Co. (Gilbane) an invitation

---

1. Since the commencement of this action, Debron has been purchased by Bristol Steel and Iron Works Co. (Bristol), which renamed Debron the Mississippi Valley Structural Steel Co. Indiana Bridge now operates as a division of Mississippi Valley Structural Steel Co., which is in turn a wholly owned subsidiary of Bristol.

\*    \*    \*    \*    \*    \*

2. Debron and Commercial also joined as an additional defendant the Aetna Casualty and Surety Co. (Aetna), against whom they filed a cross-claim for payment under two bonds furnished by Aetna on Standard's behalf. Aetna's motion for a separate trial was granted in open court and without objection on January 29, 1980. The "defendants" referred to in this opinion are Debron and Commercial.

to bid on the fabrication and erection of structural steel for a Land Level Submarine Construction Facility (Inshore) at the Groton, Connecticut headquarters of Electric Boat Division (EB), General Dynamics Corp. Gilbane was preparing its own bid to become general contractor for the project, a huge structure along the Thames River that was to measure approximately 480 feet in length by 260 feet in width by 135 feet in height. The facility was intended for use in the construction of Trident submarines, the largest class of submarines then approved by Congress. Not surprisingly, therefore, the federal government took great interest in the project and assigned it top-priority status.

One cannot appreciate the massive nature of this job without understanding, as well, the structure's inner dimensions and capacities. EB's plans and specifications called for a truss-and-column structure composed of two sections—a crane bay approximately 80 feet wide and a fabrication or service bay about 180 feet wide. The smaller bay was to house two cranes, each weighing 280 tons and having a 280-ton capacity. These cranes, which were each to be supported by two rails that ran the length of the building at an elevation exceeding 100 feet, would eventually be used to assemble the hull and other heavy parts of a submarine. The fabrication bay would be used to assemble smaller parts; these would in turn be transported to the crane bay, made into larger parts, and then assembled in the submarine.

Now fully erected, the structure, designed to carry such heavy loads, is supported by ten box columns about ten feet square and 135 feet in height each, as well as five additional columns adjacent to a pre-existing building that are also 135 feet high but are made of 36-inch frames ten feet wide. Large box trusses, up to 25 feet deep, stabilize the top-heavy load created by the weight of the cranes in the smaller bay. The roof system is supported by a series of intermediate trusses framing into these heavy trusses and, in turn, a structural system of lighter joists to pick up the roof decking. The facility can house a 9,000-ton submarine, some 50 feet in diameter and more than 400 feet in length.

After receiving Gilbane's invitation to bid on this massive project and examining a set of contract drawings, a representative of Standard contacted Albert O. Muehlenbrock, Vice-President of the Mississippi Valley Division (Mississippi Valley) of Debron, with whom Standard had previously done business, to inquire whether Mississippi Valley would be interested in fabricating the steel required for the job. Because Standard had to submit a bid to Gilbane quickly, Muehlenbrock came to the Hartford area, where Standard's headquarters are located, to view the drawings and meet with Standard's representatives. At the meeting, which occurred on or about May 26, 1973, Muehlenbrock expressed interest in fabricating the job and, accordingly, in preparing a bid. The meeting then progressed to a general discussion of various fabrication and erection needs, including the size and manner in which pieces should be fabricated, the means for delivering those pieces to the jobsite, and the number of bolts that would be required for the project. A subsequent meeting was held on June 26, 1973 in St. Louis, where Mississippi Valley was located, to coordinate fabrication and erection requirements—essentially, to cover all bases.

Standard proceeded to prepare its bid for Gilbane, incorporating Mississippi Valley's bid for fabrication and other information supplied to it by Mississippi Valley. EB thereafter awarded the general contractor's position to Gilbane, which in turn sub-contracted with Standard on November 13, 1973 for fabrication and erection. (Exh. P–2). Standard then honored Debron's request that it sub-contract with Indiana Bridge, rather than with Mississippi Valley, for fabrication of the structural steel that would be needed for erection. This sub-contract (hereinafter referred to simply as the "contract"), which Standard now claims was breached in a multitude of respects, was entered into on January 4, 1974. (Exh. P–1).

The contract required Indiana Bridge, among other things, "to complete the de-

tailing ... of all Structural Steel" to be used in the Groton project, a process through which concept sketches, shop detail drawings, and erection drawings would eventually be produced. These drawings aid the fabricator and erector in performing the work required of them. Indiana Bridge hired the St. Louis firm of Lopinot and Weber, Inc. (L & W) to prepare the necessary drawings; Standard then forwarded to L & W the contract drawings prepared by EB's consulting engineer so that L & W could begin work. (Exh. D–16).[3] After numerous discussions and revisions, a set of detail and erection drawings were approved by the owner's engineer, who issued them to Indiana Bridge so that fabrication could begin.

Fabrication of some minor steel, the slabs for the base of the columns, was commenced in May or June of 1974. Other non-critical or minor members were fabricated in late June and early July. Major components were not begun until August, September, and October. In the meantime, L & W was awaiting certain critical design information from EB's engineer on the truss-to-column connections for the structure, as well as on the internal connections for the major trusses. This information was not received until late July of 1974, stretching L & W's work on the detail drawings into late October and delaying fabrication of certain major components.

During the same period, a logistical problem developed in Groton. The original bid documents indicated that a staging area would be provided to the erector at a Central Vermont Railway pier across the Thames River and about one mile north of the jobsite. Standard later learned from Gilbane, however, that the pier would not satisfy its needs, and so a search for a new staging area was begun. Ultimately, Standard and Gilbane settled on a site in Elizabethport, New Jersey for this purpose. Indiana Bridge was then instructed to ship the fabricated steel to Elizabethport by rail, rather than to the pier along the Thames as had originally been contemplated. Standard assumed responsibility for unloading the railroad cars at Elizabethport and trucking the steel to Groton; it contracted with Standard Container Corp. (Standard Container) to perform these functions.

Erection of the EB facility began on or about January 10, 1975, and it was not long before Standard began experiencing erection difficulties in the field. These problems varied in nature: in the two-week period between January 23 and February 6, 1975 alone, Standard claims to have found material missing from the jobsite, material damaged in transit, material delivered out of sequence, pieces improperly marked, gusset plates improperly assembled, holes of improper size, and bolts difficult to tighten. Each of the alleged difficulties was recorded on an individual "error notification sheet," which briefly described the problem, usually indicated the date on which the problem was either discovered or corrected, and assigned a number to the alleged error.

By February 17, 1975, Standard's field personnel had written 30 of these error sheets, and there was no let-up in sight. On February 25, Michael D. Conte, Standard's general erection manager, called Franklyn Ford, Indiana Bridge's chief engineer at the time, to discuss the claimed errors and the corrective work that allegedly had been necessitated by many of them. This was followed up on the same day with a letter from Conte enclosing the first 30 error sheets. (Exh. P–2437). A meeting had previously been held in Muncie on Feb-

---

**3.** The contract drawings, also known as design drawings or "standards," set forth the owner's design concept and tell the fabricator the extent of the work that will be required of it. In industry practice, the fabricator, through its detailer, is responsible for interpreting the design concept and incorporating the interpretation in concept sketches, which are prepared along with preliminary framing plans. These concept sketches are ultimately sent to the owner's engineering consultant for approval. After the concept sketches are approved, the detailer prepares framing plans and, from the framing plans, prepares shop details of individual pieces. These detail drawings are drafted concurrently with erection drawings ("E-drawings"), which along with a set of instructions will aid the erector in performing its work in the field. (Transcript [Tr.] of 1/24/80, at 49–50).

ruary 6 to discuss erection difficulties, and another was scheduled for February 27 for the same purpose. Standard's minutes of these meetings are found in a letter to Indiana Bridge dated March 3, 1975, and reflect the parties' interest in cooperating with each other to some extent while minimizing their respective expenses to the greatest extent possible. (Exh. P–2438).

Standard nonetheless had to proceed with erection in spite of the difficulties it encountered. It appears that the parties agreed on March 3 that:

"In each instance, Indiana Bridge is to issue written authorization for [Standard] to proceed with required corrective work with all incurred costs chargeable to Indiana Bridge.

"Certain corrective work must be accomplished prior to erection and may, perforce, be undertaken prior to [Standard's] receipt of [Indiana Bridge's] written authorization so that the job is not delayed. Accordingly, [Standard does] not, in these circumstances, waive [its] right for reimbursement of all incurred costs." (Exh. P–2439).

But although Indiana Bridge had, by April 1, received at least 54 such error notifications, and although Standard repeatedly requested repair authorization, no such authorization was forthcoming. (Exh. P–2446).

At this point, Standard came under pressure from Gilbane and EB to proceed more quickly with erection because of the importance the federal government attached to the project, (Tr. of 1/24/80, at 18–25); it thus informed Indiana Bridge on April 1:

"This is to advise you that Standard cannot wait upon receiving any written authorization from you as Standard cannot tolerate any delays. We have proceeded to do the corrective work, as your representative well knows [4], and we intend to backcharge you for all costs, expenses, materials, losses and damages sustained by Standard arising from repair

and corrective procedures required including any damages due to delays occasioned by the faulty work." (Exh. P–2446).

Indiana Bridge's first written response to Standard's error notifications was made on May 20, 1975, and addressed error sheets 1 through 45, 47, and 49 through 89.[5] (Exh. P–5). This was supplemented by a June 4, 1976 letter from Indiana Bridge covering all the remaining error sheets received to that point, number 203 being the last one. The general thrust of these responses is contained in the May 20 letter, which stated that error sheets 1 through 89 "indicate no major fabrication errors." Essentially, Indiana Bridge denied responsibility for a large number of the alleged errors, denied that any cost or delay was incurred in the case of others, and, while "acknowledg[ing] at least partial responsibility" in the case of many, "reserve[d] the right to review and approve corrective costs." (Exh. P–5, at 2, 6).

Needless to say, the parties were unable to reach an amicable resolution of these disputed items. Consequently, Standard filed the instant action on June 2, 1976 in the Connecticut Superior Court, from whence the defendants sought removal to this court under 28 U.S.C. § 1441(a). Evidence and testimony were presented on each of the scores of claims that Standard asserts are Indiana Bridge's responsibility. Indiana Bridge, for its part, fully admits liability and the correctness of Standard's charges on a number of claims, admits liability but denies the correctness of the charges on many other claims, and fully denies responsibility for the remainder; in addition, it filed seven counterclaims against Standard, the largest representing the contract balance for which Standard fully admits liability.

The vast majority of these claims have been conveniently grouped into categories,

4. In accordance with the understandings reached at the February 27 meeting (Exh. P–2438), Indiana Bridge had sent Harold Adkins to the jobsite to act as its representative. His

duties and performance in that capacity figure prominently in other aspects of this case.

5. Indiana Bridge claimed not to have received error sheets 46 and 48. (Exh. P–5, at 1).

e. g., material missing at jobsite, bolt tightening difficulties, and so forth. This decision will accordingly treat the claims in groups, the legal issues as to each claim within a given category being largely the same, and will address individual claims where distinct issues are presented. Before moving to a discussion of the various claims, however, a short digression is necessary so that the court may address some preliminary legal issues.

## II. *PRELIMINARY ISSUES OF LAW*

\*　　\*　　\*　　\*　　\*　　\*

A ... difficult issue is posed by the parties' disagreement on whether their contract falls within the purview of the common law or the Uniform Commercial Code (UCC). Article 2 of the UCC provides in pertinent part:

"Unless the context otherwise requires, this article applies to transactions in goods; ...." 42 C.G.S. § 42a–2–102.

" 'Goods' means all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale." *Id.* § 42a–2–105(1).

The defendants argue that because every item of every kind and description furnished by Indiana Bridge was a "good" within the meaning of Article 2, the UCC is applicable to this case. The plaintiff contends that the contract it entered into with Indiana Bridge called primarily for the furnishing of services, e. g., preparing concept sketches, conferring with Standard, preparing detail drawings, fabricating steel, preparing angles, reaming holes, and so forth. The terms of the contract itself (Exh. P–1) are of little assistance in resolving this dispute. They provide rather ambiguously in section 2(A) that "[s]eller shall furnish all labor, materials, equipment and services to complete the detailing, furnishing, fabricating and delivery FOB Cars ... of all Structural Steel.".

In deciding whether the agreement in the instant case constitutes primarily a contract for services or a transaction in goods under the UCC, " '[t]he determinant is to be found in the intention of the parties .... That intention is to be ascertained from the language used, interpreted in the light of the situation of the parties and the circumstances surrounding them.' " *Epstein v. Giannattasio*, 25 Conn.Sup. 109, 112, 197 A.2d 342 (Com.Pl.1963) (quoting *United Aircraft Corp. v. O'Connor*, 141 Conn. 530, 537–38, 107 A.2d 398 (1954)). The specific question to be answered is which feature—the furnishing of services or the transfer of goods—the parties intended to constitute the predominant, as opposed to a merely incidental, aspect of the transaction. *See Gulash v. Stylarama, Inc.*, 33 Conn.Sup. 108, 111, 364 A.2d 1221 (Com.Pl.1975); *Epstein v. Giannattasio, supra*, at 25 Conn.Sup. 111–13, 197 A.2d 342.

There are no Connecticut cases directly on point with the instant one, although *Kunian v. Development Corp. of America*, 165 Conn. 300, 334 A.2d 427 (1973), is not wholly inapposite. In *Kunian*, the plaintiff was the trustee in bankruptcy for a company that "had contracted [with the defendant] to furnish plumbing and heating materials" for a low-income housing project. *Id.* at 301–02, 334 A.2d 427. The defendants were to construct the project, incorporating the material that the bankrupt company had agreed to deliver. *Id.* at 302, 334 A.2d 427. In an action by the trustee to recover the unpaid contract balance, the Supreme Court held without discussion that "[s]ince plumbing and heating supplies are movable goods, the contract in question clearly is governed by the Uniform Commercial Code." *Id.* at 308, 334 A.2d 427. *Kunian* is not perfectly analogous to our case, however, for it appears that the seller there performed no "services" other than delivery, leaving it beyond doubt that the predominant feature of that transaction was a transfer of goods.

*Gulash v. Stylarama, Inc., supra*, a Court of Common Pleas case, points in the other direction but is similarly distinguishable. In *Gulash*, the defendant agreed to " 'furnish all labor and materials, ... and to construct, ... furnish and install [a] swimming pool with vinyl liner.' " 33 Conn.Sup.

at 111, 364 A.2d 1221 (quoting the contract). Focusing on the contractual description of the transaction—"a furnishing of labor and materials," *id.*—the court held that the agreement at issue was not a "transaction in goods" under the UCC. *Id.* at 113, 364 A.2d 1221. The defendant in *Gulash,* however, unlike Indiana Bridge, actually constructed the item into which the furnished materials were incorporated.

The facts of our case thus fall somewhere between those of *Kunian* and *Gulash.* "Consequently, it is the function of this court to 'choose the rule that it believes the state court, from all that is known about its methods of reaching decisions, is likely to adopt in the future.'" *Solar Kinetics Corp. v. Joseph T. Ryerson & Son, Inc.,* 488 F.Supp. 1237, 1246 (D.Conn.1980) (quoting C. Wright, *Law of Federal Courts* § 58, at 271 (2d ed. 1976)). Analysis of the case law indicates that in deciding novel issues under Article 2, the Connecticut Supreme Court often looks to well-reasoned opinions in other jurisdictions. *E. g., Conte v. Dwan Lincoln-Mercury, Inc.,* 172 Conn. 112, 121–26, 374 A.2d 144 (1976); *Hamon v. Digliani,* 148 Conn. 710, 713–18, 174 A.2d 294 (1961); *see Solar Kinetics Corp. v. Joseph T. Ryerson & Son, Inc., supra,* at 1246. Accordingly, it is appropriate that we seek out such a case.

*Belmont Industries, Inc. v. Bechtel Corp.,* 425 F.Supp. 524 (E.D.Pa.1976), presents facts virtually indistinguishable from those before us. In that case, the Union Carbide Corporation engaged Bechtel as the general contractor for the construction of a petro-chemical complex in Puerto Rico. Bechtel invited bids to furnish and install a container handling system at the planned complex. The firm of Badrena & Perez (B & P) submitted a bid that "anticipated the erection of a large steel structure, to be used in loading and unloading ships, composed of a crane runway, over which a crane assembly would run, and a movable apron extending over the water." *Id.* at 525. Under B & P's bid, the plaintiff Belmont, for a lump-sum price, would "design the structure, fabricate the steel for it and deliver the steel to B & P in Puerto Rico," but would have no erection responsibilities.

B & P was ultimately awarded the Bechtel subcontract, and while Belmont never actually executed a sub-subcontract it proceeded to begin the work that had been contemplated by B & P's bid, thus giving rise to an implied agreement. A few months after the bidding process concluded, Belmont advised B & P, Bechtel, and Union Carbide that "due to disagreement over the employment of a consulting engineer, it could not continue to accept design responsibility for the structure." *Id.* However, Belmont did continue fabricating and delivering structural steel to the jobsite. When B & P was later relieved of its contractual duties to Bechtel because of financial difficulties, Bechtel sought from Belmont a transfer of fabrication obligations from B & P to itself. The two companies were unable, however, to agree on a price for the transfer contract. At that point, Bechtel entered into an agreement with another company to provide the remaining steel for Union Carbide's facility.

Based upon this series of events, Belmont filed suit against Bechtel and Union Carbide for breach of contract in one count and quantum meruit recovery in another. Holding that the latter count failed to state a claim on which relief could be granted, Judge Bechtle explained:

"The important point is that recovery [in quantum meruit] is based on the existence of an agreement, express or implied, for the performance of services. We hold here, however, that the contract was one for the sale of goods. Defendants contracted for the purchase of fabricated steel from plaintiff. The price which they agreed to pay was for receipt of the finished goods, not for any work and labor involved in the production of the goods."

*Id.* at 527. The court also held that Belmont's breach of contract claim was barred by the UCC's four-year statute of limitations:

"[T]he agreement sued upon here was not a construction contract, which would make the general six-year limitations pe-

riod for breach of contract applicable. . . . [S]uch a contract is one in which the obligation to furnish materials, if present at all, is merely incidental to the main purpose—namely, the assembling of the materials into a new, different and completed unit. Belmont clearly had no contractual responsibility here related to the actual building of the container handling facility. . . . [6]

"... We also consider it beyond dispute that the fabricated structural steel and accessory items to be furnished by plaintiff under the contract constituted 'goods' as that term is defined in [UCC] § 2–105(1)."

*Id.* (footnotes and citations omitted). It was of no consequence that Belmont initially agreed to provide design services:

"While there were some design aspects to plaintiff's contractual responsibilities, the Court believes that the essence of this transaction was a sale of goods.

"The design services involved here were incidental to the basic purpose of the contract, which was the provision of the structural steel to be used in the construction of the container handling facility."

*Id.* at 528.

■ The only conceivable distinction between *Belmont* and the instant case lies in Indiana Bridge's promise "to complete the detailing ... of all Structural Steel." But this fact is of no greater significance than Belmont's unfulfilled promise to design the Union Carbide Structure.

"In the instant case, there was a similar lump-sum price quotation which incorporated the cost of engineering services. . . . [T]he single compensation figure sought by [Indiana Bridge] was for the furnishing of materials to be used in

the construction of the [submarine] facility. The fact that a specially designed product to fulfill the needs of the project was required does not negate the characterization of the transaction as a sale of goods."

*Id.; see* C.G.S. § 42a–2–105(1) (referring to "specially manufactured goods"). Just as Judge Bechtle held Article 2 of the UCC applicable to the fabrication contract in *Belmont*, Article 2 as adopted and construed in Connecticut is applicable to the transaction before us.

\*      \*      \*      \*      \*      \*

*Claims 4 and 7: Additional Bolt and Stud Installations*

In claims 4 and 7, Standard seeks damages for the cost of purchasing and installing several thousand more bolts and studs than it had originally anticipated would be necessary. The thrust of the plaintiff's argument is that in calculating its bid for Gilbane, it relied on a bolt and stud estimate provided by Mississippi Valley that turned out to have been grossly inaccurate. The defendants do not deny that the figures used by Standard, which appeared on Mississippi Valley's "take-off sheets," were erroneous. However, they contend that, as a factual matter, Mississippi Valley never provided an "estimate" as such to Standard, that Standard was given the take-off sheets only as a courtesy and should have prepared its own estimate, and that it is customary in the industry for the erector to do so. Furthermore, they argue that the plaintiff's claims sound not in contract but in tort, as a cause of action for negligent misrepresentation, and that Standard was contributorily negligent.

The facts concerning claim 7, the bolt claim, are hotly disputed. Mr. Bachta testified that he agreed with Al Muehlenbrock

6. Thus, while " '[b]uilding and construction transactions which include materials to be incorporated into the structure are not agreements of sale,' " *Gulash v. Stylarama, Inc., supra*, 33 Conn.Sup., at 111, 364 A.2d 1221 (quoting *Epstein v. Giannattasio, supra*, 25 Conn. Sup., at 113, 197 A.2d 342), the contract in the instant case cannot be deemed a "building [or] construction transaction." The New York case

of *Schenectady Steel Co. v. Bruno Trimpoli General Construction Co.*, 43 App.Div.2d 234, 237, 350 N.Y.S.2d 920, *aff'd*, 34 N.Y.2d 939, 359 N.Y.S.2d 560, 316 N.E.2d 875 (1974), which involved a contract to "furnish and erect structural steel" and which was cited with approval in *Gulash*, 33 Conn.Sup. at 112–13, 364 A.2d 1221, is inapposite for the same reason.

to try working up his own estimate so that a comparison with Mississippi Valley's figures could be made. This required the design of bolted connections, rather than welded connections as shown on the design drawings. Standard found itself unable to design these connections and compile the bolt estimate figures quickly enough, and Bachta therefore called Muehlenbrock to inform him of Standard's predicament. Muehlenbrock allegedly replied, " 'Don't be concerned.... [W]e have an impirical [sic] method of preparing the quantity of bolts for this type of truss. We are well familiar with the nature of it. It's our experience and we will furnish you the number of bolts that is required by us anyway to have this bolt quantity for our own needs.' " (Tr. of 1/23/80, at 26). Muehlenbrock allegedly added that the estimate would be a conservative one, allowing sufficient leeway for possible error. When Standard received Mississippi Valley's estimate of 56,200 bolts, it relied on that figure in calculating its bid for Gilbane. In fact, well over 110,000 bolts were ultimately needed and as a result, not only were a substantial number of additional bolts installed, but a substantial amount of additional field work to install them was also necessary.

Mr. Muehlenbrock did not recall ever hearing Mr. Bachta complain about being unable to work up his own estimate, or telling Bachta he could use the estimate take-off sheets for the purpose of preparing Standard's bid, or saying that Mississippi Valley had an empirical method for preparing the bolt estimate. In fact, he testified that such a method, or any other rule of thumb, could not have been employed on a complex structure such as this one. The defendants' expert, Mr. Brown, added that an erector customarily makes an independent estimate of the number of bolts needed on a job, occasionally uses the fabricator's estimate only as a back-check, and ordinarily would have suspected an error when, as here, the estimate required only 13 bolts per ton, rather than the usual approximation of 25.

While take-off sheets are occasionally provided to the erector as a mere courtesy, there are several reasons for crediting Mr. Bachta's testimony on this bolt dispute, rather than Muehlenbrock's or Brown's. Muehlenbrock and Bachta had earlier agreed that the only way they could bid the job was with bolted connections, an option made available in EB's bid documents. But the design drawings themselves showed welded connections. Muehlenbrock agreed that Mississippi Valley would design the bolted connections. Since there was no way for Standard to know how many bolts Mississippi Valley would design into each connection, it is reasonable to conclude that Muehlenbrock did promise, as Bachta testified, to furnish Standard with an accurate bolt estimate after the connections were designed.

Because this was an unusual arrangement, with Mississippi Valley having agreed to design the connections, Mr. Brown's testimony as to industry custom has little bearing on the particular facts of this case: Standard could not reasonably have been expected to prepare an independent estimate from the design drawings when the drawings themselves showed welded connections and when Muehlenbrock had agreed to design the bolted option. Furthermore, Mr. Brown stated that as an erector, he would be alarmed by an estimate of only 13 bolts per ton "with knockdown [sic] trusses." (Tr. of 6/24/80, at 167). But as noted above, the parties contemplated the shop-assembly of most trusses and shipment of pieces as large as possible. Thus, it is not surprising that Standard was unconcerned by the low figure. Indeed, the estimates called for the installation of 35,000 shop-bolts; yet Indiana Bridge installed only some 11,000 bolts in the shop, more than 5,000 of which were mere shipping bolts.

Accepting Mr. Bachta's testimony as correct, the question next arises whether Standard's claim is barred by the tort statute of limitations or Standard's contributory negligence. The defendants suggest that the only possible theory on which the plaintiff's claim might proceed is that of negligent

misrepresentation. They overlook, however, a doctrine firmly embedded in the law of contracts and well-stated in the *Restatement of Contracts* § 90 (1932):

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

This doctrine, sometimes loosely termed promissory estoppel, has been recognized and applied in several Connecticut decisions. *Otto Contracting Co. v. S. Schinella & Son, Inc.*, 179 Conn. 704, 708, 427 A.2d 856 (1980) ("'A contractor whose expressions induce another to understand and to act in reliance on that understanding may be held responsible therefor.' 3 Corbin, Contracts § 538, p. 57 (1960)."); *Douglass v. Brandt*, 99 Conn. 161, 162–64, 121 A. 179 (1923); *State ex rel. Marsh v. Lum*, 95 Conn. 199, 202–06, 111 A. 190 (1920); *Hebrew University Association v. Nye*, 26 Conn.Sup. 342, 346, 223 A.2d 397 (1966) (quoting § 90 with approval); *see Shinabarger v. United Aircraft Corp.*, 381 F.2d 808, 810 (2d Cir. 1967) (citing *Nye*).

■ Section 90 covers the facts of claim 7 quite neatly. Here, Mr. Muehlenbrock promised to furnish an accurate bolt estimate and should reasonably have expected Standard to rely on that estimate in preparing a bid for Gilbane. Standard did rely on that estimate and suffered injury of a definite and substantial character as a result. Injustice could be avoided here only by holding that Mr. Muehlenbrock breached his promise to furnish an accurate bolt count on Mississippi Valley's behalf. Thus, the plaintiff is entitled to prevail on claim 7.

Section 347 of the Restatement limits the remedy under section 90 to restitution of "the reasonable value of a performance rendered by [the injured party], measured as of the time it was rendered, less the amount of benefits received as part performance and retained by him"—essentially, out-of-pocket costs but not consequential or incidental damages. This is the measure of recovery that Standard will be allowed on account of this claim.

■ Claim 4, the stud claim, is similar to claim 7 in that Standard again relied upon Mississippi Valley's estimate take-off sheets to conclude that 2,928 studs would be necessary on this job. Later, after Standard had already been awarded the subcontract by Gilbane, Indiana Bridge informed it that 6,150 studs would be shipped. The plaintiff actually installed 5,808 studs, or 2,880 more than the number indicated on Mississippi Valley's estimate take-off sheets. Standard proceeds on a dual misapprehension, however, in its attempt to bring this claim under the same rubric as the bolt claim.

In the first place, the plans for the installation of the crane beams and rails disclosed the information from which either party could estimate the number of studs that would be required. By contrast, the number of bolts that would be necessary was information peculiarly within Mississippi Valley's knowledge. (The bid documents allowed for either welded or bolted connections, but the design drawings showed only welded connections. Mississippi Valley was to design the bolted connections itself.) Mississippi Valley made an accurate count of the number of studs needed to install one set of rails; but, in relying on the estimate sheets, Standard apparently overlooked the fact that the plans called for *two* sets of rails. Because the fabricator had not made that mistake, it sent 6,150 studs, approximately twice the number that the plaintiff figured were necessary.

A second and crucial distinction is that Mississippi Valley did not *promise* to furnish the plaintiff with a stud count. In the absence of such a promise section 90 cannot save the plaintiff from the consequences of its error. As noted above, the crane beams and rails, where virtually all of these studs were to be welded, were shown on the owner's drawings and did not require the creation of any new or different design by Mississippi Valley. Standard was capable of working up its own estimate for bidding purposes and, in accordance with the industry custom as to which Mr. Brown testified,

should have done so in this case. This probably explains why no promise was sought or made in this instance. Claim 4 must therefore be disallowed.

\* \* \* \* \* \*

SO ORDERED.