Margaret O'LAUGHLIN, et al., Appellants,

v.

MINNESOTA NATURAL GAS COMPANY, Respondent, John L. Ries, Respondent.

No. 45892.

Supreme Court of Minnesota.

May 6, 1977.

Christianson, Ebner & Sieloff, John F. Ebner, Edward P. Starr, St. Paul, for appellants.

Coulter, Nelson & Sullivan, and Mark Sullivan, Minneapolis, for Minn. Nat. Gas Co.

Robert W. Gislason, Edina, for Ries.

YETKA, Justice.

Plaintiffs, Margaret and William O'Laughlin, brought separate actions which were consolidated for trial for injuries sustained when Mrs. O'Laughlin collapsed while walking over a floor furnace grate, fell face down onto the grate, and was severely burned. Plaintiffs alleged defective installation of the furnace. The jury found defendants not negligent and plaintiffs appeal from the judgment and from denial of their motion for a new trial on the ground the trial court erred in refusing to instruct the jury on plaintiffs' claim of breach of implied warranty and strict liability. We affirm in part, reverse in part, and remand for a new trial.

The principal issue is whether in a products-liability action it was prejudicial error for the trial court to refuse to instruct the jury on the implied warranties which may accompany a sale of goods under the Uniform Commercial Code, or on strict liability in tort under Restatement, Torts 2d, § 402 A, when the evidence introduced by plaintiffs at trial indicated that defendant subcontractor purchased and installed a floor furnace for use in a private residence and there was evidence from which a jury might find that the installation of the furnace by the subcontractor was defective and that the defect was the proximate cause of personal injuries to one of the occupants of the residence.

On the morning of January 8, 1973, Mrs. O'Laughlin was severely burned after she collapsed onto the hot grate of a gas floor furnace in her home. She had arisen from her bed several minutes before and was walking from her bedroom through the living room toward the kitchen when she passed the furnace, "felt a wave of heat coming up," and collapsed onto the hot floor register. She lay on the register face down until her husband found her and pulled her off. By this time, however, she had received third-degree burns over much of the right side of her face and chest, and on her right arm, which later required extensive skin grafting and the removal of her right eye.

Plaintiffs brought suit against John L. Ries, the subcontractor who installed the furnace, and the Minnesota Natural Gas Company, which inspected the installation of the furnace prior to connecting it to their gas lines, alleging that the furnace had been improperly installed and that as a result Mrs. O'Laughlin had been the victim of carbon monoxide poisoning and had fallen on the hot furnace grate.

Plaintiffs are an elderly couple. At the time of trial, Mrs. O'Laughlin was 73, and Mr. O'Laughlin was 75. They live in Shakopee, Minnesota, in a small two-story house which they have owned for 19 years. The upstairs of the house contains two rooms and a bathroom. The downstairs has three rooms. In 1971, the O'Laughlins decided to remodel their house because both of them had difficulty climbing stairs. They decided to close the second floor and remodel the first floor by adding a half-bath, remodeling the kitchen, and converting the living room into a bedroom. They also wanted to install a furnace to replace the two space heaters which they used to heat their home.

In August 1971, plaintiffs retained Frank Dellwo, a general contractor, to do the remodeling. Dellwo subcontracted the work to defendant Ries, a retired plumbing and heating contractor with 34 years' experience. After the general contractor explained plaintiffs' needs to him and recommended a floor furnace, Ries selected the model to be used, a 70,000 BTU capacity, Empire brand floor furnace which would attach to the basement ceiling and distribute heat into the living area above through a floor grate. Ries purchased the furnace and installed it.

Much of the testimony at trial concerns the possible defective installation of the furnace by Ries. Plaintiffs contended that installation of the furnace was faulty because, *inter alia*, a metal liner was not placed in the chimney and because a "drip-T" was not placed on the bottom of the stack to facilitate cleaning.

On January 10, 2 days after Mrs. O'Laughlin fell, an employee of defendant gas company checked the furnace for leaks and discovered that the chimney was not venting. An inspection of the furnace indicated the venting system of the furnace was clogged with dirt, leaves, and sand. Plaintiffs produced expert testimony, based on a hypothetical question, that the blockage of the venting pipe would have caused a dangerous level of carbon monoxide in plaintiffs' home on January 8, 1973. They also introduced evidence that the failure to use a metal liner when venting the flue gases through a masonry chimney did not conform to local practice or to the pertinent American Gas Association Code standards for venting of flue gases from a furnace to the outside atmosphere. Expert testimony was also introduced to the effect that if the flue gases are allowed to vent through a masonry chimney without the benefit of a metal liner, the mortar would tend to deteriorate and fall down to the bottom. The principal defense of defendant Ries was that the defects, if any, were not the proximate cause of Mrs. O'Laughlin's injuries.

Minnesota Natural Gas Company was made a defendant because of its standard practice of inspecting the installation of gas appliances prior to connecting them to the gas line. The gas company supplies natural gas to approximately 60 communities throughout Minnesota. It was the custom and practice in Scott County for the gas company to inspect gas installations for safety before connecting them for service. Ries hooked up the gas line but did not "fire" the furnace, leaving the testing and igniting of the furnace to the gas company.

At trial plaintiffs requested instructions on both implied warranties under the Uniform Commercial Code and strict liability in tort against defendant Ries only. These instructions were refused. The trial court did not explain the reasons for the denial either in the record or in a memorandum. The case was submitted to the jury on special verdict questions relating only to a negligence theory, and the jury found defendants not negligent. Plaintiffs appealed to this court from the judgment and from the denial of their motion for a new trial.

Plaintiffs contend the trial court erred in refusing to instruct the jury on implied warranties and strict liability as to both defendant Ries, who installed the furnace, and defendant Minnesota Natural Gas Company, which inspected the furnace. The possible application of these instructions to each defendant will be considered separately.

■ A showing of negligence is not necessary for a breach of warranty. As this court explained in *Kopet v. Klein*, 275 Minn. 525, 529, 148 N.W.2d 385, 389 (1967), in regard to implied warranties:

" * * * It is clear that lack of negligence on the part of a seller will not prevent a buyer from recovering for breach of warranty. This, however, is not to say that a breach of warranty may not arise from negligence."

Similarly, Restatement, Torts 2d, § 402 A, may apply even though the seller exercised all possible care in the preparation and sale of his product. See, Restatement, Torts 2d, § 402 A(2)(a). In regard to strict liability in tort under § 402 A, this court stated in *Farr v. Armstrong Rubber Co.*, 288 Minn. 83, 89, 179 N.W.2d 64, 69 (1970):

" * * * Restatement, Torts (2d) § 402 A, * * * provides generally that a commercial seller who sells a product in a defective condition unreasonably dangerous to the user is liable for physical harm to the user caused by the defective condition, *even though the seller was not negligent* and even though he was not in privity with the user. See, *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897. The rule set forth in § 402 A has been adopted as the law in Minnesota. *McCormack v. Hankscraft Co., Inc.*, 278 Minn. 322, 154 N.W.2d 488." (Italics supplied.)

1. *Application of implied warranties and strict liability to defendant Ries.*

Plaintiffs contend that Ries was a seller of goods under Article 2 of the Uniform Commercial Code and thus subject to either the implied warranty of fitness for a particular purpose or the implied warranty of merchantability. The pertinent part of Minn.St. 336.2—314 provides:

"(1) Unless excluded or modified (section 336.2—316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

"(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) *are fit for the ordinary purposes for which such goods are used* ; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmation of fact made on the container or label if any.

"(3) Unless excluded or modified (section 336.2—316) other implied warranties may arise from course of dealing or usage of trade." (Italics supplied.)

Also, Minn.St. 336.2—315 provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

Plaintiffs argue that both defendants qualify as "merchants" within the meaning of Article 2 and thus are subject to the warranty provisions of those sections. Defendants, unfortunately, do not address themselves to this argument. The entire brief of

defendant Ries argues that the jury must have found that carbon monoxide was not the proximate cause of Mrs. O'Laughlin's injuries. The jury, however, never reached that issue nor did they respond to it on the special verdict submitted to them. They merely found that defendants were not negligent.[1]

■ As applied to defendant Ries, the issue is not whether he is a merchant, but whether the alleged defect arose out of a *sale of goods*. While the scope section of Article 2 of the Uniform Commercial Code applies to "transactions in goods" (see, Minn.St. 336.2—102), the warranty sections specifically require a sale. (See, Minn.St. 336.2—314, and Minn.St. 336.2—315.) The present situation presents something slightly different from a pure sale situation where goods are sold to a customer and do not require the performance of any substantial amount of services. Plaintiffs do not allege that the furnace was defective when it left the manufacturer or that the furnace malfunctioned, but instead claim that the *installation* of the furnace by Ries was faulty. Thus, the issue raised is whether the implied warranties of the Uniform Commercial Code apply to the improper installation of a product.

■ Although the issue is a matter of some dispute in other jurisdictions, the particular instance involved here is controlled by a previous Minnesota decision under the Uniform Sales Act, *Kopet v. Klein*, 275 Minn. 525, 148 N.W.2d 385 (1967). In *Kopet*, the defendant sold a water softener to the plaintiff and the purchase price included the cost of installation. After the defendant seller installed the unit in the plaintiff's home, it failed to function properly and the buyer brought an action for breach of warranty. On appeal this court stated (275 Minn. 529, 148 N.W.2d 389):

"The liability of the seller to the buyer for negligence was very largely superseded by strict liability for breach of warranty under the Uniform Sales Act. Thus a breach of warranty giving rise to strict liability does not depend upon any knowledge of defects on the part of the seller or any negligence. Prosser, Torts (3 ed.) § 95. It is clear that lack of negligence on the part of a seller will not prevent a

1. The jury returned the following special verdict:

"1. What was the total amount of Plaintiff Margaret L. O'Laughlin's damage?
$ 100,000

"2. What was the total amount of Plaintiff William O'Laughlin's damage for loss of services of his wife?
$ 15,000

"3. What was William O'Laughlin's damage for medical expenses?
$ 12,236.66

"4. Were Plaintiffs Margaret L. O'Laughlin and William O'Laughlin negligent?
Answer Yes or No. YES

"IF YOU ANSWER QUESTION No. 4 YES ANSWER THE FOLLOWING QUESTION:

"5. Was such negligence a direct cause of the accident?
Answer Yes or No. NO

"6. Was Defendant Minnesota Natural Gas Company, its agents or employees negligent?
Answer Yes or No. NO

"IF YOU ANSWER QUESTION No. 6 YES ANSWER THE FOLLOWING QUESTION:

"7. Was such negligence a direct cause of the accident?
Answer Yes or No. _____

"8. Was Defendant John L. Ries or his agents or employees negligent?
Answer Yes or No. NO

"IF YOU ANSWER QUESTION No. 8 YES ANSWER THE FOLLOWING QUESTION:

"9. Was such negligence a direct cause of the accident?
Answer Yes or No. _____

"IF YOU ANSWER QUESTIONS 5, 7 OR 9 YES OR ANY TWO THEREOF YES, THEN ANSWER THIS QUESTION:

"10. Taking all of the negligence which contributed to the accident at 100 per cent, what percentage or proportion thereof do you attribute to:

"Margaret L. O'Laughlin and William O'Laughlin _____ %

"Minnesota Natural Gas Company _____ %

"John L. Ries _____ %

TOTAL 100 %"

buyer from recovering for breach of warranty. This, however, is not to say that a breach of warranty may not arise from negligence.

"Defendant asserts that the court erred in informing the jury that breach of implied warranty could arise by faulty installation of the unit. Essentially, the question raised by this contention seems to be whether the installation of the unit was a part of the sale covered by the warranty. In Vold, Sales (2 ed.) § 1, p. 4, the author states:

'In certain types of sales, too, certain services, such as to deliver elsewhere, or to *install*, are many times included.' (Italics supplied.)

\* \* \* \* \* \*

"The rule thus seems to be that the warranty applies where the sale involves not only a transfer of a chattel but also some related service, such as construction. We think the rule applies to this case. Plaintiff had never owned a water softener before and he knew nothing about how to install or operate one when he made the purchase from defendant. We think it clear from the record that plaintiff was purchasing an *installed* water softener."

Thus, on the basis of *Kopet* there can be little doubt that the installation of the furnace by Ries was covered by the implied warranties of the Uniform Commercial Code.[2]

In addition to implied warranties, plaintiffs also argue that the trial court should have instructed the jury on strict liability in tort under Restatement, Torts 2d, § 402 A, which provides:

"§ 402 A. Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

There is also ample precedent for applying strict liability in tort for defective products to defendant Ries. In *Worrell v. Barnes,* 87 Nev. 204, 205, 484 P.2d 573, 574 (1971), the Supreme Court of Nevada was presented with the following issue:

"\* \* \* [W]hether the doctrine [of strict liability] will be applied to the composition and installation of a residential gas system which was added to the gas system that was originally installed in the construction of a house."[3]

A contractor had installed a leaky gas fitting while remodeling the plaintiff's home and the defect later caused a fire in the plaintiff's home. In applying the doctrine of strict liability to the installation of the gas fitting, the court stressed the inherent danger of dealing with gas and the purchas-

---

2. See, also, *Insurance Co. of North America v. Radiant Elec. Co.,* 55 Mich.App. 410, 222 N.W.2d 323 (1974) (U.C.C. warranties applied to installation of electrical wiring in apartment building); *Pineau v. White,* 101 N.H. 119, 135 A.2d 716 (1957) (furnaces and heating equipment are "goods" within the meaning of the Uniform Sales Act); *Worrell v. Barnes,* 87 Nev. 204, 208, 484 P.2d 573, 576 (1971) (installation of leaky gas fitting "goods" within purview of U.C.C.).

3. See, also, *State Stove Manufacturing Co. v. Hodges,* 189 So.2d 113 (Miss.1966), certiorari denied sub nom. *Yates v. Hodges,* 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784 (1967) (strict liability applied to home builder who improperly installed pressure gauge on water heater in home); *Schipper v. Levitt & Sons, Inc.,* 44 N.J. 70, 207 A.2d 314 (1965) (strict liability applied to mass producer of homes who failed to install properly a mixing valve for delivery of hot water to sink taps).

er's reliance on the superior skill and knowledge of the contractor.

■ Thus, under either theory, defendant Ries could have been .subjected to liability. Under the strict liability theory, plaintiffs must show (1) that the product purchased was in a defective condition unreasonably dangerous for its use, (2) that such defective condition existed when the product left the hands of defendant, and (3) that the defect was the proximate cause of the injury Mrs. O'Laughlin suffered. *Lee v. Crookston Coca-Cola Bottling Co.,* 290 Minn. 321, 329, 188 N.W.2d 426, 432 (1971); *Farr v. Armstrong Rubber Co.,* 288 Minn. 83, 179 N.W.2d 64 (1970); *Magnuson v. Rupp Manufacturing, Inc.,* 285 Minn. 32, 46, 171 N.W.2d 201, 210 (1969) (Rogosheske, J., concurring specially). See, Comment, 1 Wm. Mitchell L.Rev. 207.

2. *Application of implied warranties and strict liability to defendant Minnesota Natural Gas Company.*

■ Minnesota Natural Gas Company inspected the installation of the furnace prior to connecting it to the gas line. This clearly established a duty on its part to perform that task without negligence. Plaintiffs contend that this inspection by defendant gas company created implied warranties that the installation was proper and also subjected the gas company to strict tort liability.

However, it does not appear in this case that plaintiffs requested implied-warranty and strict-liability instructions as to Minnesota Natural Gas Company. Such general instructions were requested, but they only referred to defendant Ries, and not to defendant gas company. From a reading of the requested instructions, it is not reasonable to conclude that plaintiffs asked the trial court to give these instructions in regard to the gas company. Thus, plaintiffs are not in a position to argue on appeal that such instructions should have been given as to the gas company.

As a final matter, we must question why plaintiffs never raised the issues of possible defects in the furnace itself, or of the location of the furnace grate as being contrary to installation instructions by the manufacturer, or the possibility that even if carbon monoxide gas were not present other noxious gases, such as carbon dioxide, were present which could have caused Mrs. O'Laughlin's symptoms and her resultant fall. However, plaintiffs chose to try their case only on the theory of carbon monoxide gas as being the cause of Mrs. O'Laughlin's symptoms and resultant fall.

■ Accordingly, we affirm as to defendant Minnesota Natural Gas Company, and reverse as to defendant John L. Ries, and remand for a new trial in which the trial court must give instructions on the implied warranties and strict liability in regard to defendant Ries.

Affirmed in part, reversed in part, and remanded for a new trial.

SHERAN, Chief Justice, concurring specially.

I concur with the result, but with these reservations:

The evidence in this case is only marginally adequate to support a finding that Mrs. O'Laughlin's collapse on the morning of January 8, 1973, was an effect of carbon monoxide. Dr. Spagnolo testified that it was, upon the assumption that carbon monoxide was significantly present in the home where she resided at the time she fell. Dr. Fulton Holtby, a registered professional engineer with 40 years' experience as a teacher in the Department of Mechanical Engineering, Institute of Technology, at the University of Minnesota, testified, on the basis of postaccident investigation and a hypothetical question, that in his opinion, on January 8, 1973, there was a dangerous quantity of carbon monoxide in the O'Laughlin home. Effective cross-examination served to greatly weaken the underpinnings of Dr. Spagnolo's opinion, but not quite enough, in my view, to make the issue of causation one of law.

Even more troublesome, the jury found that plaintiffs themselves were negligent but that their negligence was not a proximate cause of the accident. Given the trial

context in which these jury findings were made, it is argued that the jury intended a finding to the effect that (a) plaintiffs were negligent in permitting the venting system for the gas burner to become clogged with foreign materials, which could have resulted in the presence of carbon monoxide in the home on January 8, 1973, and (b) this negligence was not the proximate cause of the accident, because Mrs. O'Laughlin's collapse was not attributable to carbon monoxide. However, while I think that this interpretation of the jury's finding is highly probable, it is insufficiently certain, in my judgment, to justify denial of a new trial on this ground.

MacLAUGHLIN, Justice, concurring specially.

I concur in the result for the reason stated in the opinion of Mr. Chief Justice Sheran.

OTIS, Justice, dissenting.

I dissent. While it may have been error for the trial court to refuse to give plaintiffs' requested jury instructions, the jury's rejection of plaintiffs' theory of direct cause makes such error harmless at best.

At trial, plaintiffs pursued a singular theory of causation. Allegedly, defendant Ries improperly designed and installed the ventilation system for the furnace in question. Whether his alleged malfeasance is characterized as negligence, a breach of warranty, or the creation of an unreasonably dangerous product, the alleged effect of his conduct was to make the venting system susceptible to blockage through the accumulation of leaves and other debris falling from the chimney. This allegedly resulted in the exhaust fumes from the furnace, including carbon monoxide, being vented out into the basement area underneath the living quarters. Plaintiffs contended that from there the fumes seeped upwards, accumulating in the living room. When Mrs. O'Laughlin entered that room from her bedroom, she allegedly was overcome by the carbon monoxide present, lost consciousness, and fell

upon the furnace grating, suffering severe burns.

The evidence fails to support this theory of causation, as the jury verdict reflects.

The furnace which was installed by Ries was a 70,000 BTU capacity, Empire brand floor furnace. It was installed in the floor of the living room area of plaintiffs' home by being suspended from the floor joists in the basement. The body of the furnace was thus located in the basement, with a grate in the floor itself through which the heat arose from the furnace into the living room area. The portion of the furnace which transferred the heat to the grate was sealed in such a manner that it was not possible for any gases from the furnace to escape through the grate. They could only be exhausted from the furnace into the basement. To vent these gases from the furnace, Ries ran a horizontal vent pipe from the furnace to one wall of the basement. From there the pipe was connected to a vertical pipe that ran up through the floor, inside the wall of the living area, and into the bottom of an already existing chimney that extended partway down the wall of the living area. The chimney had previously been used to vent a freestanding gas space heater, and ran from the first floor living area through the second floor, and out the roof. Ries merely connected the vertical pipe to the bottom of the chimney and did not continue the piping up through the chimney as a liner.

Plaintiffs contended that the ventilation system was defective in two respects. First, it was asserted that Ries should have installed a "drip-T" at the point where the horizontal pipe met the vertical. This device, which consists of an extension of the vertical pipe downward beyond the connection with the horizontal pipe, would have allowed debris to accumulate in the bottom of the vertical pipe without blocking the horizontal one. Additionally, such a construction would have allowed plaintiffs an easy method for cleaning the ventilation system by merely removing the bottom of the vertical pipe. Ries testified that there was no room to install a "drip-T." He did,

however, construct the connection between the pipes so that by the removal of two screws the pipes could be separated for cleaning. It is uncontradicted that leaves, twigs, and other debris which had fallen from the chimney did accumulate at the connection in considerable quantities.

Second, plaintiffs produced expert testimony which indicated that it was improper for Ries to fail to line the existing chimney. The venting of the furnace exhaust directly through the masonry chimney allegedly resulted in condensation forming on the chimney walls, causing the masonry to deteriorate, and sand to fall down the chimney, adding to the blockage.

Given these conditions, plaintiffs' theory of causation was that the flue gases, unable to escape through the blocked ventilation system, "backed up" and spilled out into the basement. There they allegedly accumulated and seeped upward through the floor.

It is clear that without proof of the existence of carbon monoxide in plaintiffs' living quarters at a level sufficient to induce fainting, plaintiffs would be precluded from recovery under any legal theory that they might advance, because there would be no causal relationship between Ries' conduct and Mrs. O'Laughlin's injuries.

The normal products of the combustion of natural gas are principally water and carbon dioxide. Carbon monoxide is usually produced in only trace amounts unless the combustion occurs in an oxygen-poor environment. The presence of a pure blue flame indicates that the gas is burning completely, with sufficient oxygen. Alvin Turek, an employee of defendant Minnesota Natural Gas Company, inspected the furnace on January 10, 1973, 2 days after Mrs. O'Laughlin was injured. Before he made any attempt to clear the venting system he checked the furnace and found that flue gases were "spilling out"—that is, not venting. Nonetheless, he observed that the furnace was burning a pure blue flame, indicating that it was receiving sufficient oxygen to fully burn the natural gas. Thomas Carson, an engineer employed by Minnesota Natural Gas Company, testified that this particular furnace (and furnaces generally) was designed so that it produces minimal carbon monoxide even if the vent is for some reason obstructed.

In addition to this evidence that the furnace was, despite the blocked vent, burning normally, it appeared from the testimony that two of the basement windows near the furnace were broken at the time of the accident. This would have allowed the unvented flue gases to escape from the basement. Also, the newly remodeled floor of plaintiffs' home consisted of tongue and groove oak, covered with fir, and then carpeting, reducing the possibility that any flue gases which did accumulate in the basement would seep into the living area in any quantity.

The only evidence presented by plaintiffs of the presence of carbon monoxide were the symptoms exhibited by two children of plaintiffs who stayed with their father after the accident. On the first night they felt nauseous, and had headaches. Both are symptoms of carbon monoxide poisoning, as well as a number of other illnesses, such as influenza. They were examined by a physician, and treated with oxygen, to which they responded. The doctor rendered his opinion that they were suffering from carbon monoxide poisoning; based upon a hypothetical question, he also stated his belief that Mrs. O'Laughlin was suffering from carbon monoxide poisoning at the time of the accident.

However, the jury also considered evidence of Mrs. O'Laughlin's physical condition before the accident. On the morning in question Mrs. O'Laughlin testified that she felt fine upon awakening, in fact she "felt very good." If at that time she had been suffering from carbon monoxide poisoning, she would have felt lethargic and nauseous, and would have had a headache. She put on her robe, and walked to the living room, where she felt a "wave of heat" and passed out. Dr. John Coe, chief of pathology at Hennepin County General Hospital and the Hennepin County Medical Examiner, testified that if there had been carbon monoxide gas present in a sufficient

quantity to cause her to collapse, Mrs. O'Laughlin would have lapsed into a deep coma after the several additional minutes that she lay on the grate before her husband found her. However, immediately after she was pulled from the grate by her husband, she was conscious, and never lost consciousness after that. Her husband exhibited no symptoms of carbon monoxide poisoning, despite the fact that he sat with her in the same room for several minutes while waiting for the ambulance. Additionally, Mrs. O'Laughlin's own physician testified that she had complained to him as early as 1971 (before the furnace was installed) of experiencing feelings of light-headedness, especially prominent in the morning. He testified further that this was not an uncommon phenomenon in people of Mrs. O'Laughlin's age.

In light of the conflicting evidence, whether or not plaintiffs had established by a preponderance of the evidence their theory of causation would be a question of fact which this court could not determine as a matter of law on the present record. But the jury verdict makes that determination unnecessary. The jury found that plaintiffs were negligent, but that this negligence was not a direct cause of the accident. The significance of this finding is clear.

Plaintiffs testified that it had been their custom to clean out the ventilation system of their old space heaters on a regular basis, and were thus aware of the need for such maintenance. Yet they did not attempt to clean out the new ventilating system at any time between the installation date and the accident. The jury evidently felt that this failure was a negligent one on plaintiffs' part. It was the only conduct of plaintiffs that conceivably could have been the basis for the jury's finding of negligence.

The jury also found that this negligence was *not* a cause of the accident. The inescapable conclusion compelled by these two findings is that the jury determined that despite the blockage of the venting system, carbon monoxide did not cause Mrs. O'Laughlin to fall. This being the case,

Ries could not be liable to plaintiffs even if he breached an implied warranty or created a defective product by his design or installation of the ventilation system. The blocked pipe (which would have constituted the breach of warranty or defect) was found by the jury to not have been a cause of the accident. Thus, failure to give the requested instructions was only harmless error.

For these reasons, I would affirm.

PETERSON, Justice (dissenting).
I join in the dissent of Mr. Justice Otis.