**VALLEY FARMERS' ELEVATOR,**
petitioner, Appellant,

v.

**LINDSAY BROTHERS COMPANY, Respondent,**

v.

**MARTIN STEEL CORPORATION, Respondent.**

Nos. C6–85–1639, C0–85–2057.

Supreme Court of Minnesota.

Jan. 2, 1987.

Robert M. Halvorson, William A. Moeller, New Ulm, for appellant.

Garrett E. Mulrooney, Gordon J. Apple, St. Paul, for Lindsay Bros.

Eric J. Magnuson, Keith J. Kerfield, Minneapolis, for Martin Steel.

COYNE, Justice.

The plaintiff Valley Farmers' Elevator has obtained further review of a decision of the court of appeals affirming the trial court's entry of summary judgment in favor of the defendant Lindsay Brothers Company. 380 N.W.2d 874. The effect of the decision was to dismiss the plaintiff's claim for economic loss arising from the damage to a grain storage system purchased from the defendant. We affirm.

Intending to expand its grain storage facilities, the plaintiff's predecessor in interest, Wegdahl Co-operative Elevator Association, contacted Lindsay Brothers, a distributor of agricultural equipment and industrial supplies, in early 1977. While there is substantial dispute over the extent to which Lindsay actually designed the system and selected its component parts, the record discloses that Lindsay's grain drying and storage system proposal was approved, although never formally signed, and the three-bin system was completed and operational by November 1977. The final payment of the full contract price of more than $500,000 was tendered on September 12, 1977.

The system was designed not only for grain storage, but also for the retention of the product in optimum condition. To dry and cool the stored grain, the three ring-bolted steel grain bins were equipped with negative flow aeration systems which, through the use of fans located at or near the base of the structures, draw air from the outside through roof vents and exhaust it near the base. The fans were controlled manually and were not equipped with automatic control switches activated by changes in humidity or air pressure.

With the exception of a repair to the center bin's sagging roof in 1978, the system functioned properly from 1977 to December 1981. On Friday, December 4, 1981, the manager of the elevator started the aeration fans, intending them to operate throughout the ensuing weekend. While the weather on that Friday was clear and cool, it became foggy and cool on Saturday. After the aeration fans had been in operation approximately 15 hours, another employee noticed that the roof and sides of the center bin had collapsed inward, as if a partial vacuum had been created. An accumulation of frost on the exterior roof vents had prevented the free flow of air, apparently severely damaging the bin. The 100,000 bushels of soybeans stored in the bin were unharmed.

The owner's manual for the system cautions against operating the aeration devices during the winter and spring months when the relative humidity generally exceeds 50 percent, and, while Valley has neither admitted nor denied receipt of an owner's manual in 1977, it has indicated that it possesses four manuals containing the warning. We note that the record discloses that Martin Steel Corporation, the manufacturer of the bins, contends that it advised Lindsay that inclusion of the automatic control switch was necessary and that its cost was minimal, approximately $200.

Valley commenced this action against Lindsay seeking recovery under tort theories of negligence, with regard to the system design and the failure to warn, and strict liability for damage to the grain storage bin. It claimed damages totalling $86,247.57, including $74,247.50 for the cost of repair to the bin, $10,000 for the loss of use of the bin during its repair, and $2,000 for the cost of transferring the soybeans to another storage facility. The parties then stipulated that Lindsay would implead Martin Steel as a third-party defendant.

The trial court, relying upon *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn.1981), granted Lindsay's motion for summary judgment. The court of appeals affirmed.

The thrust of the plaintiff's argument on appeal is that economic losses arising out of this hybrid commercial transaction involving the provision of services and the sale of goods are recoverable under negligence and strict liability theories. It has attempted to factually distinguish *Superwood* to conclude that the Uniform Commercial Code (U.C.C.), Minn.Stat. ch. 336 (1984), to the extent it is viewed as an exclusive remedy, is inapplicable.

It is well settled in this state that Article 2 of the U.C.C. provides the exclusive remedy for economic losses arising from commercial transactions not involving personal injury or damage to other property. *Superwood*, 311 N.W.2d at 162. By its terms, Article 2 applies only to contracts involving the sale of goods, Minn.Stat. § 336.2–102, and defines "goods" as:

> [A]ll things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action. 'Goods' also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (section 336.2–107).

Minn.Stat. § 336.2–105(1).

Valley first contends that *Superwood* and its progeny, *Minneapolis Society of Fine Arts v. Parker-Klein Associates Architects Inc.*, 354 N.W.2d 816 (Minn.1984) and *S.J. Groves & Sons Company v. Aerospatiale Helicopter Corp.*, 374 N.W.2d 431 (Minn.1985), are distinguishable not only because the defendants therein were manufacturers, not distributors—as it characterizes Lindsay—but also because those actions were not predicated upon allegations relating to the defendants' provision of services.

We reject the asserted manufacturer-distributor distinction, relying upon explicit language contained in Article 2 defining a "merchant", Minn.Stat. § 336.2–104(1) (1984), and delineating a merchant's various rights and obligations. *See, e.g., id.* § 336.2–314. In the doubtful event that the legislature had intended to except the class of "merchants" or distributors from the purview of Article 2 dealing with "transactions and goods," it would certainly not have comprehensively addressed that class' duties, rights, and remedies.

This court has not, however, specifically addressed the question of whether and under what circumstances a hybrid contract involving the sale of goods and the provision of services falls within the statutory scheme of the U.C.C. As early as 1967, in interpreting the Uniform Sales Act, we stated that the rule "seems to be that the warranty applies where the sale involves not only a transfer of a chattel but also some related service, such as construction." *Kopet v. Klein*, 275 Minn. 525, 530, 148 N.W.2d 385, 389–90 (1967). After the legislative adoption of the U.C.C., we cited *Kopet* as controlling of the decision that U.C.C. warranty provisions were applicable to the installation of a product. *O'Laughlin v. Minnesota Natural Gas Company*, 253 N.W.2d 826 (Minn.1977).

We are able to discern virtually no distinction between Valley's claims that Lindsay's failure to install an automatic shutoff device to stop the aeration fan once frost had accumulated was negligence and those advanced in *O'Laughlin*. In the latter case, the plaintiffs contended that in-

stallation of a gas floor furnace was faulty because a metal liner was not inserted in the chimney and a certain product designed to facilitate cleaning was not included.

It would now seem appropriate for this court to engage in a more detailed examination of such a hybrid contract in accordance with the guidelines discussed in *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir.1974). Recognizing that the sale of goods is often accompanied by the rendition of services either incidental to or an integral part of that sale, the court cited with approval an analysis offered in R. Nordstrom, *Handbook of the Law of Sales*, 40, 44 (1970), to support its conclusion that the fact that substantial labor was involved in the contract does not necessarily exclude the transaction from coverage under the Code. The court then enunciated the "predominant factor" test by which a hybrid contract, such as the one before it, might properly be characterized. The question as to the classification of a hybrid contract is generally one of law.

We adopt the "predominant factor" test, and, in application of that test, we conclude that whatever the extent of the design services or selection of component parts by Lindsay, the substantial or predominant purpose of the contract here was the sale of goods, not the rendition of services. *See, Aluminum Company of America v. Electro Flo Corp.*, 451 F.2d 1115 (10th Cir.1971). *Cf. East River Steamship Corp. v. Transamerica Delaval, Inc.*, —— U.S. ——, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (Contract for design, manufacture, and supervision of installation of turbines. Damage to turbines from design defect gives rise to a warranty claim, not a claim cognizable in tort). Of the full $504,000 contract price, less than $120,000 can be identified as attributable to "labor." That factor is not persuasive that the essence of the contract was the provision of services. Services are always required to convert raw materials into a useful product. That some added service is required to install or apply the product does not transform a contract of sale into a

contract for services. Moreover, no part of the labor charge included in the contract is designated as compensation for the defendant's alleged design of the system, a factor indicative of the tangential and incidental nature of those services.

While an application of the predominant factor test has resulted in our classification of the transaction as a sale rather than a provision of services, one commentator has suggested that where one is dealing with "specially manufactured" goods, the classification problem is eliminated by the U.C. C.'s "unqualified declaration that goods include 'specially manufactured' goods." 1 R. Anderson, Uniform Commercial Code § 2–105:42 (1981). In consideration of either theory, the service aspect of this transaction is incidental and the transaction itself is governed by Article 2 of the U.C.C.

We then address Valley's claim that the system is an improvement to real property and that, as such, Minn.Stat. § 541.051 (1984) provides it with a separate cause of action based upon negligence. It contends that an application of *Superwood* would render any cause of action available under the statute meaningless. We reject this argument. The time for testing whether a transaction is a sale of goods— i.e., a sale of movable things—is at the time of identification to the contract, which here occurred before the installation of the grain storage system. Minn.Stat. § 336.2– 105(1) (1984). *Bonebrake*, 499 F.2d at 958, n. 12. Even if by attaching movable objects so that upon completion of the contract they are immovable the grain storage system can be said to be an improvement to real estate, section 541.051 is only a general statute of limitations prescribing the time within which Valley might have asserted common law claims. *In re Daniels' Estate*, 208 Minn. 420, 294 N.W. 465 (1940). Because we have determined that by application of *Superwood*, the U.C.C. offers the exclusive remedy, no common law claims remain.

In conclusion, this transaction and claims arising therefrom are governed by our decision in *Superwood* and Article 2 of the

U.C.C. As a result, a timely action must necessarily have been commenced within four years after accrual of the cause of action, Minn.Stat. § 336.2–725(1) (1984). In the case of an alleged breach of warranty, tender of delivery is critical. *Id.* § 336.2–725(2). While we recognize that the statute of limitations ran on the breach of warranty action before the damage occurred, the action is nevertheless time barred as not commenced within four years after the November 1977 tender of delivery, and the trial court correctly granted the defendant's motion for summary judgment.

YETKA, Justice (dissenting).

In *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn.1981), this court held that Article 2 of the Uniform Commercial Code provides the exclusive remedy for economic losses arising from commercial transactions not involving personal injury or damage to other property. In *Superwood*, I dissented, believing that the U.C.C. was not meant to be the sole source of relief for commercial losses and that it was inadequate to protect buyers from negligent manufacturers. However, I am willing to accept the logic that a commercial buyer complaining of a defect in a good, such as a piece of machinery or a storage bin, should be relegated to the U.C.C. rules designed to regulate the sale of goods uniformly. What is not clear, however, is that the U.C.C. rules should apply to the appellant's particular cause of action in this case; for the defect complained of here was not in a good sold, but in important design services that were neglected.

Valley Farmers hired Lindsay Brothers to install storage bins for grain on their premises. This contract was at the instigation of Lindsay, who assured Valley that they would design the storage bins and choose the necessary component parts. In fulfillment of their contract, Lindsay acquired various components for the storage bins, getting materials for the bins from one company and air blowers from another.

The assembled storage bins were, however, deficient in design. At the bottom of the grain storage bins were fans that drew air through the grain so as to keep it dry and cool. If the weather were cold and damp, frozen moisture could cause the air vents at the top of the bins to freeze and stick. If, as happened here, the vents were to stick while interior fans were running, the vacuum that results would cause the walls of the bin to collapse.

One who is injured should be allowed to sue for failures of design when the design aspects of an installation are a significant part of the contract, as they were here. Valley paid over $100,000 of a $500,000 contract for labor services in this sale. The storage bins were not a routine combination of materials, but a coordinated system of separate machines. Apparently, it was Lindsay's success in persuading Valley that they would design good storage bins that led to the contract. It seems inconsistent that, having bought Lindsay's expertise, Valley is not allowed to sue on the basis of defects in this expertise. If Lindsay had offered to provide blueprints of a storage bin design and then subsequently and separately had provided the materials to construct the bins, Lindsay would clearly be liable for a defect in the initial design. Again, if Lindsay had contracted to outside architects for the design of the storage bin, then those architects could be held liable. It is anomalous to hold that any separate liability for negligent services evaporates when the contract for services is inseparably merged with the supply of goods.

Analyzing commercial transactions on such a separated basis would not conflict with earlier precedent. In *Superwood* and its progeny, this court has held that economic losses from commercial transactions are covered by the U.C.C., but it has not barred future courts from defining commercial transaction so as to exclude service aspects. Similarly, in *O'Laughlin v. Minnesota Natural Gas Company*, 253 N.W.2d 826 (Minn.1977), this court held that U.C.C. warranties could cover defects in installation, but did not say that the

U.C.C. *must* cover ancillary issues of service.

This is not the type of case where the U.C.C. was intended to apply. The sale involved was only partly a sale of goods. An important part of the transaction was the sale of design abilities, which failed. I would reverse the court of appeals and allow suit to be brought against the designers who happened also to be the installers, Lindsay Brothers.