**WESTERN LAKE SUPERIOR SANITARY DISTRICT,**
Appellant,

v.

**ORFEI & SONS, INC., PRC Engineering, Inc., Madison Management Group, Inc., Respondents.**

**INTERPACE CORPORATION, et al.,**
**Defendants and Third–Party**
**Plaintiffs, Respondents,**

v.

**CONSOER, TOWNSEND & ASSOCIATES, INC., et al., Third–Party**
**Defendants, Respondents.**

**No. C3–90–589.**

Court of Appeals of Minnesota.

Dec. 11, 1990.

Review Denied Feb. 20, 1991.

Paul F. Schweiger, Stephanie A. Ball, Fryberger, Buchanan, Smith & Frederick, P.A., Duluth, for Western Lake Superior Sanitary District.

Michael A. Trittipo, Fredrikson & Byron, P.A., Minneapolis, for Orfei & Sons, Inc.

Gene W. Halverson, Eric D. Hylden, Halverson Watters Bye Downs Reyelts & Bateman, Ltd., Duluth, for PRC Engineering, Inc.

Thomas R. Thibodeau, Johnson, Killen, Thibodeau & Seiler, P.A., Duluth, G. Lee Garrett, Jr., William B.B. Smith, Jones, Day, Reavis & Pogue, Atlanta, Ga., for Madison Management Group, Inc.

Thomas R. Thibodeau, Duluth, G. Lee Garrett, Jr., Pogue, Ga., for Interpace Corporation, et al.

Gene W. Halverson, Eric D. Hylden, Duluth, for Consoer, Townsend & Associates, Inc., et al.

Considered and decided by CRIPPEN, P.J., and FOLEY and SCHUMACHER, JJ.

## OPINION

FOLEY, Judge.

This is an appeal from summary judgment dismissing appellant Western Lake Superior Sanitary District's claims as being barred by the statute of limitations of Minn.Stat. § 541.051, subd. 1(a) (1988). Respondent Orfei & Sons, Inc. has noticed review of whether the Sanitary District's

claims are barred by contractual agreement and the statute of limitations for contract actions. Respondent Interpace Corporation has noticed review of whether the Sanitary District's claims are barred by the Uniform Commercial Code. We affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

## FACTS

On December 2, 1971, the Sanitary District contracted with respondent Consoer, Townsend & Associates, Inc. (now known as PRC Engineering) for Consoer to perform engineering services in connection with the construction of a waste water treatment system. The Sanitary District alleges Consoer undertook overall responsibility to see that the project would meet Consoer's design data.

The Sanitary District also entered into a contract on September 30, 1974, with Orfei for installation of a Division E section of pipeline. Interpace designed and manufactured the 1,400 16–foot sections of pre-stressed pipe used in Division E pursuant to a contract between it and Orfei. Respondents Madison Management Group, Inc., Clevepak Corp. and GHA Lock Joint, Inc. are alleged to have succeeded to liabilities of Interpace.

The Sanitary District points to several contract provisions that it alleges created a continuing obligation on the part of Consoer to the Sanitary District. The Sanitary District also notes Consoer sent representatives to investigate when problems later developed.

Respondents allege Division E was substantially completed by November 1, 1975. The Sanitary District acknowledges accepting Division E as complete on September 1, 1976.

On December 3, 1980, a rupture in the shaft of a 16–foot section of the Division E pipeline occurred, discharging 300,000 gallons of sewage into the Maki swamp and 30 million gallons of sewage into the St. Louis River. In a December 11, 1980 letter to the Minnesota Pollution Control Agency, David R. Shefchik, an engineer with the Sanitary District, wrote:

It is my opinion that this failure is an isolated incident and that the pipe was either originally defective or somehow damaged during installation, and failed at the time when the system was momentarily subject to a regular and normal surge (change of pump sequence at the Scanlon lift station). The surges over a period of time evidently so weakened the pipe as to eventually cause its failure.

Another rupture occurred on March 3, 1981, spilling 180,000 gallons of sewage into the swamp and 22.5 million gallons of sewage into the river. The rupture was within 90 feet of the first rupture. On March 9, 1981, Shefchik wrote notes of a telephone call he made to Harry Brenner at Interpace. He said:

I informed Harry of the urgency in reaching some conclusions regarding the failures at Scanlon and he said he is sure their company would be willing to carry out any type of testing at any location we would wish.

* * * * * *

Harry did say he is concerned about the 14 pieces of pipe * * * in the area of the latest failure * * * as he feels additional pipe may have been damaged by surges.

Harry is confident that the Interpace pipe will pass the test.

On March 6, 1981, the Sanitary District sent two samples of the reinforcing wire from the second ruptured pipe to Lakehead Testing Laboratory, Inc. in Duluth for tensile tests. Lakehead's March 19, 1981 report shows the tensile strength was far greater than that indicated in the Interpace shop drawing.

The Sanitary District hired an independent consulting engineering firm, RREM, Inc., on March 16, 1981. RREM was authorized to "investigate the probable cause of the pipeline failures through the analysis of possible transient pressures." At his deposition, Shefchik testified the Sanitary District thought the transient pressures should be checked because Harry Brenner of Interpace had told the Sanitary District

that 14 lengths of pipe near the rupture sites might be at risk due to surge pressure and prior damage to the pipe.

In its report, RREM recommended the Sanitary District install new valves and make changes in the pump control and operation to minimize the possibility of excessive pressures occurring in the pipeline. During 1981, the Sanitary District made some of the suggested changes in the pipeline. The report also noted a danger of underground pipe breakage due to frost in the geographical area. The report suggested there might be other damaged pipe in the area of the ruptures.

Testing of pipes from the second rupture was also done at the Interpace laboratory. On June 30, 1981, Interpace submitted a report that concluded both ruptures were associated with pump switching operation and power interruption, the wire generally met contract standards and additional pipe probably was damaged in the area of the two ruptures. It recommended examination of pipe remaining in the area.

On August 13, 1981, Consoer sent the Sanitary District information about new valves as recommended by RREM. That information consisted of a Consoer internal memorandum from George Ku to Wesley Gallup. In it, Ku said, "these valves should provide the needed protection to the force main pipeline."

On April 28, 1982, the Division E pipeline ruptured again, spilling 360,000 gallons of sewage into the swamp and 14.4 million gallons of sewage into the river. According to an affidavit filed by Shefchik, the Sanitary District thought the April 28, 1982 rupture was the result of pipe having been damaged by pressure surges related to the first two ruptures. The Sanitary District alleges it thought the changes to the pump control systems and the replacement of the pipe it considered surge-damaged would solve any future problems.

There were no more problems with the Division E pipeline for nearly 3½ years. On September 5, 1985, another rupture occurred. It spilled 36.3 million gallons of sewage into the river.

The Sanitary District sent wires from the 1985 ruptured pipe to Twin City Testing in St. Paul, Minnesota for a metallurgical examination. Twin City issued a report on November 11, 1985, in which it was concluded the wire was defective because it contained longitudinal seams. It was suggested that the same process that produced the high tensile strength found by the tests done by Lakehead and Interpace also produced the defective seams.

In December 1985 homeowners living around the swamp sued the Sanitary District for discharge of sewage into the swamp. On July 24, 1986, the Sanitary District sued Orfei and Interpace. The Sanitary District did not sue Consoer then.

The homeowners started new lawsuits against the Sanitary District, Orfei, Interpace and Consoer in St. Louis County on March 11, 1987 and dismissed their suits brought in Carlton County in 1985. The homeowners' suits were eventually consolidated with the Sanitary District's suit.

The pipeline broke for a fifth time on August 17, 1987. The Sanitary District has since replaced all of the Division E pipeline.

Orfei and Interpace served summary judgment motions on October 26, 1987, raising a variety of defenses. Consoer admitted service of the Sanitary District's lawsuit on November 10, 1987. Shortly thereafter, the summary judgment motions of Orfei and Interpace were heard by the trial court and were denied by order of December 31, 1987.

On January 17, 1990, the trial court granted summary judgment dismissing the Sanitary District's claims. The Sanitary District now appeals. Orfei and Interpace have filed notices of review.[1]

## ISSUES

1. Is the waste water treatment system an improvement to real property within the meaning of Minn.Stat. § 541.051?

---

1. For a reported case involving the same parties, see *Western Lake Superior Sanitary Dist. v. Interpace Corp.*, 454 N.W.2d 449 (Minn.App.1990).

2. Did the trial court err in granting summary judgment that the Sanitary District's claims are barred by the two-year statute of limitations of Minn.Stat. § 541.051?

3. Are the issues raised in the notices of review of Orfei and Interpace reviewable?

4. Are the Sanitary District's claims against Orfei contractually barred?

5. Are the Sanitary District's claims against Interpace governed by the Uniform Commercial Code?

### ANALYSIS

■ 1. The Sanitary District argues for the first time on appeal that the waste water treatment system is not an improvement to real property. As a general rule, we must confine our consideration to those issues that were before the trial court. *Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn. 1988). Furthermore, the Sanitary District stated in its response to a request for admission that the pipeline is an improvement to real property. In any event, there is little doubt the pipeline comes within Minn. Stat. § 541.051. *See Ocel v. Eagan,* 402 N.W.2d 531 (Minn.1987); *Calder v. City of Crystal,* 318 N.W.2d 838 (Minn.1982); *Capitol Supply Co. v. City of St. Paul,* 316 N.W.2d 554 (Minn.1982).

2. The Sanitary District asserts the trial court erred in granting summary judgment that its claims are barred by the two-year statute of limitations of Minn.Stat. § 541.051. We agree.

■ Rule 56 summary judgment motions are not designed to decide disputed and disclosed issues of material fact; their function is to determine if there are issues of fact. *Schumacher v. Heig,* 454 N.W.2d 446, 448 (Minn.App.1990) (citing *Sauter v. Sauter,* 244 Minn. 482, 484–85, 70 N.W.2d 351, 353 (1955)). It is not the role of the trial court, or this court, after having determined there are material fact issues, to then decide those issues. *See Schumacher,* 454 N.W.2d at 449 (summary judgment is not a substitute for trial on the merits).

Minn.Stat. § 541.051, subd. 1(a) provides:

Except where fraud is involved, no action * * * in contract, tort or otherwise to recover damages for any injury to property * * * arising out of the defective * * * condition of an improvement to real property * * * shall be brought * * * more than two years after discovery of the injury.

The limitation period begins to run "when the injury should have been discovered in the exercise of due diligence." *200 Levee Drive Assoc. v. Bor–Son Bldg. Corp.,* 441 N.W.2d 560, 564 (Minn.App.1989).

■ The trial court found the commencement of suit against all of the defendants was not within the two-year limit of Minn. Stat. § 541.051. The trial court applied language from *Wittmer v. Ruegemer,* 419 N.W.2d 493 (Minn.1988), that

when sudden, calamitous damage arises out of a hidden defect, the date of the owner's discovery may be a matter for summary disposition.

*Id.* at 497.

The trial court said the "sudden calamitous damage" and geyser-like explosions of the 1980, 1981 and 1982 ruptures placed the matter "well within the *Wittmer* decision." The trial court also noted the Sanitary District determined after the first rupture that the pipe could be defective or have been damaged in installation and that, after the second rupture, the Sanitary District's attorney reported the cause was bad pipe, installation damage, improper engineering or all of the above.

We find the trial court erred in concluding reasonable minds would not have differed as to the existence of a defective condition more than two years before the Sanitary District brought suit. The pipe ruptures certainly released a calamitous volume of the waste water. "Calamity," however, is relative. Significant to our decision here is the fact Division E, which is but one of many divisions of a pipeline extending hundreds of miles, is itself a 22,770–foot–long pipeline through which hundreds of millions of gallons of waste water passes, and the ruptures in the pipes that led to this lawsuit occurred only in 16–foot sections. Given the magnitude of

the overall project and in light of all of the circumstances, we cannot say as a matter of law on the present state of the record that we are led to an inescapable conclusion as to when a defective condition could or should have been discovered.

We note the dictum in *Wittmer* relied upon by the trial court immediately precedes the following holding:

> But if reasonable minds may differ about the time of discovery or when the defective and unsafe condition should have been discovered in the exercise of reasonable diligence, the question is one for the trier of fact.

*Id.* The Sanitary District has shown the existence of a genuine issue of material fact as to when it discovered the pipe was defective. The Sanitary District has produced evidence it thought the first rupture was caused by pumping problems, the next two ruptures resulted from damage caused by the first rupture and the problem was remedied after the third rupture. *See Lake City Apartment v. Lund–Martin Co.*, 428 N.W.2d 110, 112 (Minn.App.1988) (fact questions found as to date of discovery where, two years after leakage was thought to be fixed with pumping changes, plaintiff discovered piping was defective), *pet. for rev. denied* (Minn. Oct. 19, 1988).

■ The Sanitary District's claims of fraud and concealment on the part of Consoer and Interpace also supply a basis for finding a fact question as to when, in the exercise of reasonable diligence, the Sanitary District should have discovered the pipe was defective. *See Wittmer*, 419 N.W.2d at 498 (fraudulent concealment relevant to whether plaintiff should have discovered problem sooner by exercise of reasonable diligence). If there was fraud and concealment, it could be found the Sanitary District was lulled into a false sense of security and prevented from discovering the defective pipe.

The Sanitary District argues an application of the retroactive amendment of Minn. Stat. § 541.051 to the Sanitary District's claims is unconstitutional. That amendment was made applicable to all matters pending as of April 24, 1988. 1988 Minn.

Laws ch. 607, §§ 1, 4. Prior to the amendment, the limitation period began to run when, in the exercise of reasonable diligence, the *defective condition* should have been discovered. *Wittmer*, 419 N.W.2d at 497. The amended statute provides the limitation period begins to run when, in the exercise of reasonable diligence, the *injury* should have been discovered. *200 Levee Drive*, 441 N.W.2d at 564.

We do not decide the constitutionality of the retroactive amendment because where, as here, the provision of piping in a defective condition *is* the injury, our analysis under either law remains the same. *See Lake City*, 428 N.W.2d at 112 (summary judgment inappropriate under either *Wittmer* or 1988 amendment of Minn.Stat. § 541.051 for injury consisting of defective joints in plumbing); *see also 200 Levee Drive*, 441 N.W.2d at 564 (remand to consider if there was fact question as to whether awareness of injury was when plaintiff got engineering report that brick facade was defective).

The Sanitary District also argues its claims should not have been dismissed because of equitable estoppel or independent acts of fraud, misrepresentation and undertaking of a duty to disclose. Because of our determination there are factual questions as to whether the Sanitary District's claims are barred by the statute of limitations of Minn.Stat. § 541.051, we leave consideration of those issues to the trial court at such time as may be appropriate.

■ 3. We disagree with the Sanitary District that the issues raised by Orfei and Interpace are not reviewable. It is proper for respondents to preserve alternative rationales for a lower court's decision. *Hoyt Inv. Co. v. Bloomington Commerce & Trade Center Assocs.*, 418 N.W.2d 173, 175–76 (Minn.1988).

■ 4. Irrespective of the application of Minn.Stat. § 541.051, we find suit against Orfei to be barred. The Sanitary District has all but conceded its claims against Orfei should be dismissed in light of special contractual provisions that Orfei is liable for defective materials and work-

manship for only one year after substantial completion. *See Indep. Consol. School Dist. No. 24 v. Carlstrom*, 277 Minn. 117, 122, 151 N.W.2d 784, 787 (1967) (interpreting virtually identical contract language).

The Sanitary District acknowledges accepting Division E as complete on September 1, 1976. Based on the undisputed and disclosed facts, and in the absence of any claim of fraud or misrepresentation by Orfei, we affirm the trial court's dismissal of the Sanitary District's claims against Orfei on other grounds. We do not reach whether the Sanitary District's claims against Orfei are also barred by the six-year statute for contract actions contained in Minn. Stat. § 541.05 (1976).

■ 5. Interpace contends the Sanitary District's claims against it are barred by the Uniform Commercial Code. The trial court found the Sanitary District's claims against Interpace were not governed by the U.C.C. because the contract was predominantly for the provision of services. *See* Minn.Stat. § 336.2–102 (1976) (article 2 of the U.C.C. applies only to contracts for the sale of goods). Whether a hybrid contract is characterized as for goods or services is generally a question of law. *Valley Farmers' Elevator v. Lindsay Bros.*, 398 N.W.2d 553, 556 (Minn.1987).

In its December 31, 1987 order denying Interpace's motion for summary judgment, the trial court determined that the contract was one for engineering design services. The trial court said, "the nature of the contract is one for services, in that Interpace designed the pipe for a particular project and then tested it." The evidence sustains that finding. Thus, the U.C.C. does not apply.

### DECISION

Affirmed in part, reversed in part and remanded.